THE NORTH CAROLINA STATE BAR v. JAMES B. ETHRIDGE, ATTORNEY, DEFENDANT

No. COA07-802

(Filed 19 February 2008)

**1. Attorneys— discipline—handling of client funds—intent to misappropriate**

Substantial evidence in the whole record supported a DHC finding that an attorney had engaged in professional misconduct in his handling of the funds of a client with dementia. Although defendant argued otherwise, the record showed that defendant had the requisite intent to misappropriate the funds.

**2. Attorneys— discipline—handling of client funds—failure to deliver funds to guardian**

The DHC did not err by concluding that an attorney violated the Rules of professional Conduct in his handling of the funds

of a client suffering from dementia after a guardian was appointed. Defendant's conduct in failing to immediately deliver all of the client's funds to her guardian and requiring the guardian to sign a release shows an intent to hide the client's funds from the guardian.

**3. Attorneys— discipline—transfer of property to himself—deceitful act**

The evidence supported the DHC's findings and those finding supported conclusions that an attorney violated the Rules of Professional Conduct by placing tax stamps on a deed indicating an erroneous value for property he transferred from a client with dementia to himself. Although defendant's statements contradicted the State Bar's evidence, the DHC had the opportunity to observe defendant and judge his credibility. Moreover, even if defendant's statements are taken as true, he was still engaged in an inherently deceitful act.

**4. Attorneys— discipline—consideration of remorse**

Consideration of remorse as a mitigating factor for an attorney being disciplined was within the discretion of the DHC, which did not abuse its discretion in this case by not considering defendant's remorse.

**5. Attorneys— discipline—weighing aggravating and mitigating factors**

Even if an attorney had not abandoned his assignments of error concerning aggravating and mitigating factors, the record shows that those facts were weighed by the DHC and it cannot be said that its valuation of these factors was arbitrary.

**6. Attorneys— discipline—disbarment—protection of public**

The DHC did not err by concluding that disbarment of an attorney being disciplined was the only sanction that can adequately protect the public in a case that involved transferring money and property from a woman with dementia to the attorney. The DHC's conclusions had a rational basis in the evidence.

Judge Wynn concurs in result only.

Appeal by defendant from order by the Disciplinary Hearing Commission of the North Carolina State Bar entered 16 November 2006. Heard in the Court of Appeals 15 January 2008.

**N.C. STATE BAR v. ETHRIDGE**

[188 N.C. App. 653 (2008)]

*The North Carolina State Bar, by Counsel Katherine Jean and by Deputy Counsels A. Root Edmonson and David R. Johnson, for plaintiff-appellee.*

*Woodruff, Reece & Fortner, by Michael J. Reece, for defendant-appellant.*

CALABRIA, Judge.

James B. Ethridge ("defendant") appeals the order of a panel of the Disciplinary Hearing Commission ("DHC") disbarring him from the practice of law. We affirm.

Defendant received a license to practice law in the State of North Carolina in 1973. In 2004, after practicing law for over thirty years in North Carolina, defendant was elected district court judge. On 16 August 2001, Rosalind W. Sweet ("Ms. Sweet") met with defendant in his law office in Smithfield, North Carolina for assistance to safeguard property she owned. At the time of this meeting, Ms. Sweet was 69 years old and was suffering from dementia. After the meeting, defendant prepared a deed describing Ms. Sweet's property as lot number eleven Old Mill Property ("Ms. Sweet's property" or "the property"). The grantor on the deed for the property was Ms. Sweet and defendant was the grantee. The next day, on 17 August 2001, defendant drove Ms. Sweet to the State Employees Credit Union, where Ms. Sweet maintained a savings account. Ms. Sweet withdrew $14,249.11 from her account and obtained a money order made payable to her in the amount of $14,249.11. Defendant and Ms. Sweet then took the money order to Four Oaks Bank where defendant opened a new, personal account in his name only with the account number ending 706 ("account No. 706"). After endorsing the money order, defendant deposited the entire proceeds into his new account.

Also on 17 August 2001, defendant recorded the deed in the Register of Deed's Office of Johnston County that transferred Ms. Sweet's property to defendant. He then attached $24 in revenue stamps to the deed. Defendant mistakenly believed that the $24 value of revenue stamps would reflect that a purchase price of $48,000 had been paid for the property. However, the $24 in revenue stamps represented on the public record only $12,000, not $48,000 of consideration for the property.

On 28 August 2001, Ms. Sweet was placed in a family care home. On 20 September 2001, defendant withdrew $750 from account No.

706. On 24 September 2001, defendant wrote a check payable to the Four Oaks Bank in the amount of $13,499.11, that was drawn on account No. 706, and opened another personal checking account at the Four Oaks Bank in his name only, with the account number ending in 606 ("account No. 606"). Defendant deposited the $13,499.11 into his personal account No. 606.

Between 24 September 2001 and 28 September 2001, defendant paid a contractor, Broderick Parrott ("Parrott"), $3,000 in cash from his personal funds as a deposit for repairs to the property. Specifically, Parrott replaced siding, windows, and doors on the property Ms. Sweet deeded to defendant. Between 24 September 2001 and 18 October 2001, defendant wrote three checks, drawn on account No. 606, to himself, his wife, and a third party. The sum of these three checks totaled $850.

On 2 October 2001, attorney Thomas S. Berkau ("Berkau") filed a petition, on behalf of Ms. Sweet's nephew, Roosevelt Williams, Jr. ("Williams"), to have Ms. Sweet adjudicated as incompetent because she suffered from dementia and Alzheimer's disease. On 18 October 2001, Ms. Sweet was adjudicated as incompetent and Williams was appointed as her general guardian.

On 30 October 2001, defendant went to Berkau's office. Berkau told defendant that he was the attorney for William, Ms. Sweet's general guardian. Defendant acknowledged to Berkau that Ms. Sweet had conveyed her real property to him and that she had withdrawn funds from her account with the State Employees Credit Union. Defendant agreed to return Ms. Sweet's property and Berkau told defendant he would send Williams to get Ms. Sweet's funds from defendant. On 31 October 2001, defendant reconveyed the property to Ms. Sweet, wrote a check payable to cash in the amount of $8,000, drawn on account No. 606, and deposited the check into his trust account.

On 16 November 2001, Williams went to defendant's office to retrieve Ms. Sweet's funds. Defendant wrote a check from his trust account in the amount of $8,000 and gave the check to Williams. On 21 December 2001, defendant wrote a check in the amount of $500 payable to cash from account No. 606. Later, on an undetermined date, prior to 2 January 2002, Parrott returned the $3,000 deposit to defendant that defendant previously gave him.

On 2 January 2002, Williams went to defendant's office demanding that defendant return the remainder of Ms. Sweet's money. De-

fendant subsequently wrote a check, from a personal account ending in number 364 ("account No. 364"), in the amount of $4,000 to Williams as guardian ad litem for Ms. Sweet. In addition, defendant prepared a written release for Williams' signature that "releases and discharges [defendant] from all claims, damages or money that maybe [sic] owed to [Ms. Sweet] arising out of a disputed amount of money that was given to [defendant] to hold for her." Williams signed the release and received the check.

On 17 January 2001, defendant wrote a check payable to cash, drawn on account No. 606, in the amount of $85. On 4 February 2002, defendant wrote a check to himself in the amount of $3,700 that was drawn on account No. 606, and on the same day deposited this check into his personal bank account No. 364. On 11 August 2003, defendant closed account No. 606 at the Four Oaks Bank by withdrawing the balance in the amount of $243.01.

On 17 May 2006, the State Bar filed a complaint with the DHC against defendant. The State Bar alleged defendant's conduct violated Rules 8.4, 1.17, and 1.15(a) of the Revised Rules of Professional Conduct. Based on the evidence presented above, the DHC concluded that defendant had violated each of the Rules of Professional Conduct the State Bar claimed. The DHC's conclusions of law were stated as follows:

a. by depositing the entrusted funds of Ms. Sweet into his own personal checking account, by writing checks from this account to himself and others, by taking cash from this account, and by failing to return portions of Ms. Sweet's funds to the rightful owner, Defendant misappropriated Ms. Sweet's funds that had been entrusted to him in a fiduciary capacity to his own use, and thus engaged in criminal acts reflecting on his honesty, trustworthiness, or fitness as a lawyer in violation of Rule 8.4(b), engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and prejudiced or damaged his client during the course of the professional relationship in violation of Rule 8.4(g).

b. by depositing the $14,249.11 of Ms. Sweet's funds into his own personal bank account, Defendant failed to maintain fiduciary funds separate from his property in violation of Rule 1.15-2(a) and failed to deposit funds belonging to another received by him as a lawyer in a trust or fiduciary account in violation of Rule 1.15-2(c);

c. by disbursing funds belonging to Ms. Sweet for the benefit of himself and third parties, Defendant used entrusted property for his own personal benefit and the benefit of other persons other than the legal or beneficial owner of the property in violation of Rule 1.15(j);

d. by preparing and recording a deed conveying Ms. Sweet's 11 Old Mill property to himself when it was never Ms. Sweet's intent for him to own the property, Defendant failed to maintain fiduciary property identified separately from the property of the lawyer in violation of Rule 1.15-2(a); engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c); engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d); prejudiced or damaged his client during the course of the professional relationship in violation of Rule 8.4(g); and engaged in a conflict of interest in violation of Rule 1.7(a)(2); and

e. by falsely representing on the public record that he had given Ms. Sweet $48,000 in consideration for the property she deeded to him on August 17, 2001, Defendant engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

Based on its conclusions, and the evidence presented, the DHC ultimately concluded disbarment was the only appropriate sanction for defendant. From the order of discipline, defendant appeals.

On appeal, defendant argues (i) the DHC erred in finding that defendant had engaged in conduct that violated Rule 8.4(c), 8.4(d), and 8.4(g); (ii) the DHC erred in improperly weighing the aggravating and mitigating factors; and (iii) the DHC erred in concluding that disbarment rather than a lesser punishment is the only sanction that can adequately protect the public.

I. Standard of review

Our standard of review is "the whole record test, which requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law." *N.C. State Bar v. Leonard,* 178 N.C. App. 432, 437, 632 S.E.2d 183, 187 (2006) (internal quotation marks omitted) (citations omitted). After reviewing the whole record, this Court "must determine whether the

DHC's decision has a rational basis in the evidence." *Id.* (internal quotation marks omitted) (citations omitted).

[T]he following steps are necessary as a means to decide if a lower body's decision has a 'rational basis in the evidence': (1) Is there adequate evidence to support the order's expressed finding(s) of fact? (2) Do the order's expressed finding(s) of fact adequately support the order's subsequent conclusion(s) of law? and (3) Do the expressed findings and/or conclusions adequately support the lower body's ultimate decision? We note, too, that in cases such as the one at issue, e.g., those involving an 'adjudicatory phase' (Did the defendant commit the offense or misconduct?), and a 'dispositional phase' (What is the appropriate sanction for committing the offense or misconduct?), the whole-record test must be applied separately to each of the two phases.

*N.C. State Bar v. Talford*, 356 N.C. 626, 634, 576 S.E.2d 305, 311 (2003).

II. Rule 8.4 of the North Carolina Rules of Professional Conduct

**[1]** We first address defendant's argument that the DHC erred in finding that defendant's conduct violated Rule 8.4 of the North Carolina Rules of Professional Conduct. Specifically, defendant contends that the DHC erred in concluding that defendant (i) engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c), (ii) intentionally prejudiced or damaged his client during the course of the professional relationship in violation of Rule 8.4(g), and (iii) engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d). Defendant also contends the DHC erred in its finding of fact:

44. [Defendant's] handling of Ms. Sweet's funds subsequent to the initial transfer of August 17, 2001, and his own conflicting explanations relating to the handling of the funds, however, compel the hearing committee to find that *he had an intent to misappropriate* and did in fact misappropriate funds of Ms. Sweet by the time he wrote checks from entrusted funds to himself and others and took cash from the account containing Ms. Sweet's entrusted funds.

Defendant contends this finding was not supported by clear, cogent, and convincing evidence. We disagree.

"Adequate evidence in this circumstance is synonymous with substantial evidence, and evidence is substantial if, when considered as a whole, it is such that a reasonable person might accept [it] as adequate to support a conclusion." *Leonard*, 178 N.C. App. at 438, 632 S.E.2d at 185 (alteration in original) (internal quotation marks omitted) (citations omitted). "The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn." *Talford*, 356 N.C. at 632, 576 S.E.2d at 310. However, the 'whole-record test' does not require this Court to reverse the DHC's decision for the mere existence of contradictory evidence in the record. *See Leonard*, 178 N.C. App. at 439, 632 S.E.2d at 187. Rather, "the whole record rule requires the court, in determining the substantiality of evidence supporting the Board's decision, to take into account whatever in the record fairly detracts from the weight of the Board's evidence." *Id.* (internal quotation marks omitted) (quoting *Elliott v. North Carolina Psychology Bd.*, 348 N.C. 230, 237, 498 S.E.2d 616, 620 (1998)).

In the instant case, defendant argues he lacked the intent to deceive or defraud Ms. Sweet; therefore, his lack of intent renders the DHC's finding that he had engaged in professional misconduct pursuant to Rule 8.4 erroneous.

The intent element for misappropriation is essentially the same as the crime of embezzlement. *See State v. Foust*, 114 N.C. 842, 843, 19 S.E. 275, 275 (1894) ("To embezzle may mean to 'appropriate to one's own use,' but it embraces also the meaning 'to misappropriate.' Indeed, 'to misappropriate' is given as a synonym of 'to embezzle' . . . ."); *State v. Ellis*, 33 N.C. App. 667, 672, 236 S.E.2d 299, 303 (1977). This Court previously determined the requisite intent element for the crime of embezzlement is:

> the intent to willfully or corruptly use or misapply the property of another for purposes other than for which the agent or fiduciary received it in the course of his employment. It is not necessary, however, that the State offer direct proof of fraudulent intent, it being sufficient if facts and circumstances are shown from which it may be reasonably inferred.

*State v. Pate*, 40 N.C. App. 580, 583-84, 253 S.E.2d 266, 269 (1979). In addition, a person who deposits funds into a personal account knowing that the money belongs to others is sufficient evidence to show embezzlement. *See generally State v. Melvin*, 86 N.C. App. 291,

298-99, 357 S.E.2d 379, 384 (1987) (where defendant knowingly deposited a check from the Veteran's Administration into his personal account was sufficient evidence to show embezzlement).

The State Bar presented the following evidence: On 16 August 2001, Ms. Sweet met with defendant in his law office to seek his advice and assistance in safeguarding her property from her relatives. At the time of the meeting, Ms. Sweet was 69 years old and suffered from dementia. On 28 August 2001, Ms. Sweet was placed in a family care home.

On 20 September 2001, defendant withdrew $750 from account No. 706 by check number 526 payable to cash. Defendant testified that he gave Ms. Sweet $350 of the cash from check number 526 when he visited her at the family care home. However, there is no evidence in the record to show Ms. Sweet ever received the $350. Defendant testified he paid Glenwood Carter $75 for lawn maintenance for Ms. Sweet's residence. Defendant then testified that he kept the remaining $325 as a partial reimbursement for the $3,000 deposit he had given to Parrott for repairs to be completed on Ms. Sweet's residence. However, both defendant and Parrott testified that Parrott later returned the $3,000 deposit to defendant. This was the same amount of money that defendant had previously given Parrott.

On 24 September 2001, defendant closed account No. 706 at the Four Oaks Bank. Defendant said the reason he initially closed the account was to open a new trust account and place the funds into the trust account. He then changed his mind and opened up a second personal account, No. 606, in his name only. He deposited the entire balance of $13,499.11 from the previous account No. 706 into account No. 606 at the Four Oaks Bank. Defendant then wrote three checks, totaling $850, that were drawn on account No. 606 to himself, his wife, and a third party. There is no evidence in the record to show any of these checks benefitted Ms. Sweet. Defendant testified that these three checks totaling $850 were intended as a partial reimbursement for the $3,000 he previously had paid to Parrott. However, assuming arguendo, defendant's testimony is true, his statements do not explain why he wrote a check to a third party that was drawn on his personal account which contained Ms. Sweet's funds if he was seeking partial reimbursement. Furthermore, as we noted earlier, Parrott testified he returned the $3,000 to defendant. There is no evidence in the record that defendant reimbursed either Ms. Sweet or Williams the funds previously taken from his personal

account containing Ms. Sweet's funds as a "partial reimbursement" for the deposit he gave Parrott.

Therefore, we find this evidence shows defendant had the intent to "willfully or corruptly use or misapply the property of another for purposes other than for which the agent or fiduciary received it in the course of his employment." *Pate*, 40 N.C. App. at 584, 253 S.E.2d at 269. Since we find defendant possessed the requisite intent to misappropriate Ms. Sweet's funds, we therefore hold DHC's finding of fact #44 is supported by substantial evidence in the whole record.

**[2]** Defendant argues that the DHC erred in concluding he violated Rule 8.4(c), 8.4(d), and 8.4(g). Rule 8.4 of the Rules of Professional Conduct states in relevant part:

It is professional misconduct for a lawyer to:

. . . .

c. engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

d. engage in conduct that is prejudicial to the administration of justice;

. . . .

g. intentionally prejudice or damage his or her client during the course of the professional relationship, except as may be required by Rule 3.3

N.C. Rev. R. Prof. Conduct 8.4 (2006).

In the instant case, Berkau said that when defendant came to his office on 30 October 2001, defendant told him that after he cashed Ms. Sweet's money order, he gave her $7,000 in cash and placed the remaining amount in an account until Ms. Sweet or her family could decide what to do with the money. Berkau also testified defendant later told Berkau that "if the $7,000 could not be found and [Williams] was insistent on all the money being returned, [defendant] would have to make arrangements to borrow the rest of the money to pay back the full $14,249.11." This statement implies defendant never gave Ms. Sweet the $7,000 since he apparently anticipated that the money would not be missed. Moreover, aside from defendant asserting he gave Ms. Sweet $7,000, there is no evidence in the record to show that he did, in fact, give Ms. Sweet her funds after he cashed the

money order. However, defendant testified that he never gave Ms. Sweet $7,000 in cash.

On 30 October 2001, defendant transferred $8,000 from his personal account No. 606 to his trust account. This was the account that held Ms. Sweet's funds. After this transfer, defendant still retained a balance of $4,633.36 of Ms. Sweet's funds in his personal account No. 606. Defendant then wrote a check for $8,000 drawn on his trust account and gave it to Williams. After receiving the check for $8,000, Williams continued to call defendant's office because he believed defendant had not given him all of Ms. Sweet's money. On 2 January 2002, defendant paid $4,000 to Williams. Defendant contends he did not give Williams the entire balance of Ms. Sweet's funds because he had promised Ms. Sweet that he would hold her money for her because she told him not to allow her relatives to have all her money. Defendant required Williams to sign a handwritten release that asserted there was a "disputed" claim for the funds, but that Williams discharges defendant "from all claims, damages or money maybe [sic] owed to [defendant]."

However, the record shows defendant owed more than $4,000 to Williams. After defendant gave Williams the check for $4,000, defendant had paid Williams a total amount of $12,000. However, defendant initially received a money order from Ms. Sweet that totaled $14,249.11. Thus, after 2 January 2002, defendant still owed Williams $2,249.11. Yet, although defendant still owed Williams money, defendant required Williams to sign a release discharging defendant from any liability.

Moreover, the record shows defendant used Ms. Sweet's funds in account No. 606 for purposes other than for Ms. Sweet's benefit. The 27 November 2001 bank statement for account No. 606 revealed a balance of $4,633.36. On 21 December 2001, defendant wrote a check for $200 that was drawn on account No. 606. The 26 December 2001 bank statement for account No. 606 showed a balance of $4,133.36, with $500 of debits. There is no evidence in the record to show the $500 worth of debits was used to benefit Ms. Sweet. On 17 January 2001, defendant wrote a check for $85 that was drawn on account No. 606. The 25 January 2002 bank statement revealed a balance of $4,048.36 in account No. 606. On 31 January 2002, defendant wrote a check to himself for $3,700 that was drawn on account No. 606. The 26 February 2002 bank statement for account No. 606 showed a balance of $348.36. Between February 2002 and July 2003, Four Oaks Bank removed monthly service charges from account No. 606. On 11 Au-

gust 2003, defendant closed his personal account No. 606 by withdrawing the balance of $243.01. Thus, the record reveals defendant used his client's own funds for purposes other than her benefit.

Defendant contends Ms. Sweet wanted him to hold her funds for her in order that her relatives, particularly Williams, could not steal her money. Defendant argues that as soon as Williams was appointed as guardian for Ms. Sweet, he began to take Ms. Sweet's money for his own benefit, and not for the benefit of Ms. Sweet. Defendant's argument is without merit. Pursuant to N.C. Gen. Stat. § 35A-1241 (2006), once a guardian has been appointed, the guardian has various powers and duties including making provisions for the incompetent person's "care, comfort, and maintenance." While the guardian has statutory powers, the guardian is supervised by the clerk of the superior court. *In re Caddell*, 140 N.C. App. 767, 769, 538 S.E.2d 626, 627-28 (2000) ("The Clerk of Superior Court has original jurisdiction over matters involving the management by a guardian of her ward's estate."). Furthermore, if Williams failed to use Ms. Sweet's money for her benefit, he would be held liable for any loss Ms. Sweet incurred as a result of Williams' actions. *See generally Kuykendall v. Proctor*, 270 N.C. 510, 155 S.E.2d 293 (1967) (a guardian is liable to the ward's estate for any loss incurred as a result of the guardian's failure to act in due diligence).

Thus, assuming arguendo, defendant's statements are true, defendant could have and should have requested a hearing with the clerk of the superior court to hold Williams liable for misusing Ms. Sweet's funds. Defendant's conduct in failing to immediately deliver all of Ms. Sweet's funds to her guardian and requiring her guardian to sign a release before giving him Ms. Sweet's funds shows defendant's intent to hide Ms. Sweet's funds from the guardian.

**[3]** Regarding Ms. Sweet's deed, defendant contends that he mistakenly placed stamps on the deed that he thought showed a value of $48,000 instead of the actual value in the amount of $12,000. However, on 12 September 2001, defendant called Wendy Whitfield ("Ms. Whitfield"), a Johnston County social worker, to inform her of his intent to safeguard Ms. Sweet's property since she had been placed in a family care home. Ms. Whitfield's written notes of the telephone conversation state in relevant part:

> [Defendant stated] that he want[ed] to know what was happening with [Ms. Sweet] because the property that she use to live on was deeded to him. . . . He [stated] that property was deeded on

8/17/01 and that [Ms. Sweet] decided to do this because she owed him for past representation. . . . [Defendant stated] that he just wanted to know if [Ms. Sweet] was going to return home so that he could do something with her things such as putting them into storage. [Social worker] inquired if it was an option for [Ms. Sweet] to return home. [Defendant stated] that he felt like [Ms. Sweet] was where she needed to be and that he does not think he would allow her to return to the home.

Defendant avers that although he mistakenly placed an incorrect number of stamps on the deed, he did not engage in conduct involving dishonesty, deceit, fraud or misrepresentation in violation of Rule 8.4(c) and 8.4(d). Defendant contends it was Ms. Sweet's idea to hide the nature of the transaction from her family by placing the revenue stamps on the deed. If we take defendant's statements as true, defendant is still admitting that he engaged in an inherently deceitful act.

While defendant's statements contradict the State Bar's evidence, this evidence does not support reversal. We note the role of an administrative agency:

it is the prerogative and duty of that administrative body, once all the evidence has been presented and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the administrative body to determine, and it may accept or reject in whole or part the testimony of any witness.

*Woodlief v. North Carolina State Bd. of Dental Examiners*, 104 N.C. App. 52, 57-58, 407 S.E.2d 596, 599-600 (1991) (internal quotation marks omitted) (citation omitted).

Thus, the DHC had the opportunity to observe defendant and judge his credibility and "the probative value" of his testimony. *Id.* As such, we find the DHC's findings of fact are supported by adequate evidence and those findings support the DHC's conclusions of law that defendant violated Rule 8.4(c), 8.4(d), and 8.4(g). These assignments of error are overruled.

### III. Aggravating and Mitigating Factors

**[4]** Defendant next argues that although he presented substantial evidence of his remorse, the DHC erred in failing to consider defendant's

remorse as a mitigating factor, and improperly weighed the aggravating and mitigating factors. We disagree.

During a disciplinary hearing, the DHC considers the following evidence:

> (w) If the charges of misconduct are established, the hearing committee will then consider any evidence relevant to the discipline to be imposed, including the record of all previous misconduct for which the defendant has been disciplined in this state or any other jurisdiction *and any evidence in aggravation or mitigation of the offense.*
>
>     . . . .
>
> (2) The hearing committee *may* consider mitigating factors in imposing discipline in any disciplinary case, including the following factors:
>
> (A)  absence of a prior disciplinary record;
>
> (B)  absence of a dishonest or selfish motive;
>
> (C)  personal or emotional problems;
>
> (D)  timely good faith efforts to make restitution or to rectify consequences of misconduct;
>
> (E)  full and free disclosure to the hearing committee or cooperative attitude toward proceedings;
>
> (F)  inexperience in the practice of law;
>
> (G)  character or reputation;
>
> (H)  physical or mental disability or impairment;
>
> (I)  delay in disciplinary proceedings through no fault of the defendant attorney;
>
> (J)  interim rehabilitation;
>
> (K)  imposition of other penalties or sanctions;
>
> (L)  remorse;
>
> (M)  remoteness of prior offenses.

N.C. Admin. Code tit. 27, r. 1B.0114(w) (August 2006) (emphasis added).

N.C. STATE BAR v. ETHRIDGE

[188 N.C. App. 653 (2008)]

In reviewing the DHC's consideration of mitigating and aggravating factors prior to imposing discipline, our standard of review is abuse of discretion. *Leonard*, 178 N.C. App. at 444, 632 S.E.2d at 191. "Under the abuse-of-discretion standard, we review to determine whether a decision is manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision." *Mark Group Int'l, Inc. v. Still*, 151 N.C. App. 565, 566, 566 S.E.2d 160, 161 (2002).

In the instant case, defendant argues that pursuant to N.C. Admin. Code tit. 27, rule 1B.0114(w), the DHC was required to "consider any evidence relevant to the discipline imposed." Therefore, because the evidence was clear defendant deeply regretted how he handled Ms. Sweet's property and finances, the DHC should have considered his remorse as a mitigating factor. Defendant's interpretation of the administrative code is mistaken. Section 1B.0114(w) of the Code states that the DHC "will consider any evidence relevant to the discipline imposed" and included in this evidence is "any evidence in aggravation or mitigation of the offense." However, N.C. Admin. Code tit. 27, r. 1B.0114(w)(2) states, "[t]he hearing committee *may* consider mitigating factors in imposing discipline[.]" Therefore, it is in the discretion of the DHC whether to consider the mitigating factor of remorse before imposing discipline.

Because it was in the DHC's discretion whether to consider the mitigating factor of remorse, the DHC was not required to consider defendant's remorse. Thus, we cannot say the DHC abused its discretion in not considering defendant's remorse before imposing discipline.

[5] Defendant also contends the DHC erred in failing to properly weigh the aggravating and mitigating factors. The DHC found the following aggravating and mitigating factors:

1. [Defendant's] misconduct is aggravated by the following factors:

    (a) A dishonest or selfish motive; and

    (b) Substantial experience in the practice of law.

2. [Defendant's] misconduct is mitigated by the following factors:

    (a) Absence of a prior disciplinary record;

    (b) Good character and reputation; and

    (c) Delay in the disciplinary proceedings not attributable to him.

Defendant avers that although the DHC found "substantial experience in the practice of law," as an aggravating factor, defendant's substantial experience in the practice of law was not in the area of trusts and estates but rather, criminal law. Defendant contends that the DHC should have assigned greater weight to defendant's lack of a previous disciplinary record. In addition, defendant argues the DHC should have given more weight to the fact that there was a delay in the disciplinary proceedings not attributable to him.

We first note that defendant fails to cite any authority for his assignments of error regarding DHC's failure to properly weigh the aggravating and mitigating factors. As such, these assignments of error are deemed abandoned pursuant to N.C.R. App. P. 28(b)(6) (2006) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."). Moreover, even if defendant did not abandon these assignments of error, we cannot say that the DHC improperly weighed the aggravating and mitigating factors. The record shows the DHC weighed mitigating and aggravating factors. We cannot say that the DHC's valuation of the aggravating and mitigating factors was "manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision." *Mark Group Int'l*, 151 N.C. App. at 566, 566 S.E.2d at 161. Therefore, these assignments of error are overruled.

## IV. Sanctions

**[6]** Defendant lastly argues the DHC erred in concluding disbarment, rather than a lesser punishment, is the only sanction that can adequately protect the public.

Regarding the punishment of disbarment, our Supreme Court has held:

in order to merit the imposition of 'suspension' or 'disbarment,' there must be a clear showing of how the attorney's actions resulted in significant harm or potential significant harm to the entities listed in the statute, and there must be a clear showing of why 'suspension' and 'disbarment' are the only sanction options that can adequately serve to protect the public from future transgressions by the attorney in question.

*Talford*, 356 N.C. at 638, 576 S.E.2d at 313.

Defendant contends that the DHC's conclusions of law that defendant's actions "caused significant harm to his client," and "[de-

fendant's] violation of his duty to preserve his clients' entrusted funds caused significant harm to the legal profession" are not supported by any evidence in the record. Defendant contends there is no evidence that Ms. Sweet was harmed. Defendant avers Ms. Sweet ultimately received all of her money and without significant harm to her, there can be no significant harm to the legal profession.

We disagree with defendant's arguments that Ms. Sweet was not harmed and ultimately received all her money. First, there is conflicting evidence in the record that Ms. Sweet did, in fact, receive all her money. As stated earlier, on 16 November 2001, defendant gave Williams a check for $8,000. On 2 January 2002, defendant gave Williams a check for $4,000 and required Williams to sign a release and a receipt for receiving all the funds. On 17 August 2001, the initial deposit into defendant's personal account No. 706 was $14,249.11. However, on 2 January 2002, the total amount of money Williams had received from defendant was $12,000. Thus, defendant still owed Williams a balance of $2,249.11.

Defendant said he did not give Williams the $2,249.11 because Ms. Sweet did not want him and other relatives to have the money. However, once Williams was appointed as Ms. Sweet's guardian, defendant was not able to decide whether he should give the money to Williams or abide by Ms. Sweet's wish. *See generally* N.C. Gen. Stat. § 35A-1241. Defendant testified he placed the remaining cash balance of $2,249.11 in a sealed envelope that he gave to Rev. Johnny B. Woodhouse ("Rev. Woodhouse"). Rev. Woodhouse testified he put the envelope in a safe deposit box and it remained there from January 2002 until January 2006. Defendant said he received the $2,249.11 from Parrott, who returned the $3,000 he had received as a deposit for work on Ms. Sweet's residence. However, on 20 September 2006, defendant met with Berkau at the clerk of court's office to give Berkau the remaining $2,249.11 of Ms. Sweet's funds. Defendant gave Berkau an envelope containing $2,250 in cash consisting of twenty dollar bills. Defendant testified that this was the same money that Parrott had paid him in late 2001. Defendant's testimony conflicts with Parrott's testimony. Parrott testified he returned the money to defendant in one hundred dollar bills in cash. Moreover, there is no evidence in the record to show defendant paid either Ms. Sweet or her guardian the funds he kept as "partial reimbursement" for the deposit he paid to Parrott after Parrott returned the deposit. Thus, we conclude that defendant kept some of Ms. Sweet's funds, and as such, defendant's conduct did harm Ms. Sweet.

**N.C. STATE BAR v. ETHRIDGE**

[188 N.C. App. 653 (2008)]

In addition, aside from the fact defendant did not return all of Ms. Sweet's or her guardian's funds, defendant's conduct further harmed Ms. Sweet. Between January 2002 and January 2006, Ms. Sweet's funds totaling $2,249.11 simply remained in Rev. Woodhouse's safe deposit box. Defendant did not invest the funds on behalf of Ms. Sweet. Furthermore, between January 2002 and January 2006, the $2,249.11 balance of Ms. Sweet's funds were not used for Ms. Sweet's benefit. Berkau testified the funds were needed to support Ms. Sweet in her assisted living status.

Therefore, based upon our review of the evidence, findings, and conclusions, we hold the DHC's conclusions of law declaring defendant's conduct posed significant harm to his client and the legal profession has a rational basis in the evidence. These assignments of error are overruled.

### V. Conclusion

After reviewing the DHC's order under the whole-record standard of review, we find adequate and substantial evidence supporting the DHC's findings and those findings support its conclusions that defendant violated Rule 8.4(c), (d), and (g) of the Rules of Professional Conduct. We determine that the DHC properly weighed the mitigating and aggravating factors before imposing discipline. We further find that the DHC's findings and conclusions support its ultimate decision to disbar defendant.

Affirmed.

Judge McGEE concurs.

Judge WYNN concurs in the result only.