JACKSON, Justice.
In this case we consider whether the North Carolina State Bar Disciplinary Hearing Commission (DHC) has the authority to investigate and discipline sitting Judge Jerry R. Tillett (defendant) for his conduct while in office. Because we conclude that the DHC lacks this authority, we reverse the DHC’s denial of defendant’s motion to dismiss and remand this case to the DHC to dismiss with prejudice the complaint of the North Carolina State Bar (State Bar) against defendant.
Defendant has served continuously as a judge in Judicial District One of the General Court of Justice, Superior Court Division, from the time of the circumstances giving rise to this case until the present. On 16 February 2012, the Judicial Standards Commission (JSC) commenced a formal investigation into defendant’s “interactions with employees and officials of the Town of Kill Devil Hills, including his involvement in orders entered against the town, and regarding his interactions with the District Attorney’s office of the 1st Prosecutorial District including pressuring that office to pursue certain legal actions.” Based on its findings and conclusions, the JSC imposed a public reprimand on defendant.
*266 According to the public reprimand, on 4 April 2010, Kill Devil Hills Police detained defendant’s adult son for an unspecified reason. Eleven days later, on 15 April, defendant arranged a meeting with officials from the Town of Kill Devil Hills and its police department in defendant’s chambers. Defendant complained about his son’s detention “as part of a series of other complaints about incidents of misconduct involving” the police department. According to those who participated in the meeting, defendant then became agitated and confrontational in his warnings to town officials to address the complaints and engaged in “discussion of a superior court judge’s ability to remove officials from office,” causing some individuals to feel “threatened.”
The public reprimand also states that throughout 2011 defendant received “communications from Kill Devil Hills police officers with grievances against Chief of Police Gary Britt and Assistant Town Manager Shawn Murphy related to personnel issues.” During this period, defendant also received “complaints about the performance of the District Attorney of the 1st Prosecutorial District.” Concluding from the complaints “that Chief Britt was guilty of professional malfeasance,” defendant attempted to convince the District Attorney and members of his staff “that it was their duty to file a petition for the removal of Chief Britt.” The District Attorney and his staff “ultimately concluded that there was insufficient evidence to support such a petition.” On 24 June 2011, defendant then sent a letter to Chief Britt notifying him about complaints of his professional misconduct and further warning Chief Britt that “to the extent that allegations involve conduct prejudicial to the administration of justice, conduct violative of public policy, and/or violations of criminal law including obstruction of justice, oppression by official, misconduct in public office and/or substantial offense, this office will act appropriately in accord with statutory and/ or inherent authority.” This letter was printed on defendant’s judicial stationery and defendant signed it “in his capacity as Senior Resident Superior Court Judge.”
In addition, the public reprimand notes that on 19 September 2011 defendant drafted and executed an order for production of copies of the private personnel records of several town employees, including Chief Britt and Murphy, to be delivered to him “for an in camera review, for the protection of integrity of information, to prevent alteration, spoliation, for evidentiary purposes and or [sic] for disclosure to other appropriate persons as directed by the Court.” Defendant issued this order on his own initiative without a request from any employee of the town, anyone in the District Attorney’s office, or any of the complainants who previously had contacted defendant.
*267 The public reprimand further notes that on 6 January 2012, defendant sent a letter to Murphy, also on judicial stationery “and signed in his capacity as Senior Resident Superior Court Judge,” alleging receipt of “complaints of professional misconduct” against Murphy and warning Murphy that “to the extent that allegations involve conduct prejudicial to the administration of justice, conduct violative of public policy, and/ or violations of criminal law including obstruction of justice, oppression by official, misconduct in public office and/or substantial offense, this office will act appropriately in accord with statutory and/or inherent authority.” That same day defendant met with the District Attorney and a member of the District Attorney’s staff “in reference to complaints lodged against the District Attorney’s office and the office’s failure to file a petition against Chief Britt.” A sheriffs deputy was present at this meeting in defendant’s chambers, which, in conjunction with defendant’s “critical and aggressive comments, had the effect of intimidating the officials from the District Attorney’s office.”
Finally, the reprimand states that even though defendant later recused himself from matters involving complaints against the Kill Devil Hills Police Department and the District Attorney’s office, he continued to involve himself in the adjudication of the complaints by communicating with judges who were involved in the matter “through suggested orders, and his appellate filings in defense of such suggested orders.”
Based on these findings of fact, the JSC determined that both defendant’s initial confrontation with town officials in his chambers and later in his capacity as Chief Resident Superior Court Judge “created a reasonable and objective perception of conflict that tainted his subsequent use of the powers of his judicial office in matters adversarial to these officials.” The JSC also determined that defendant’s attempts to address complaints against Chief Britt, Murphy, and the District Attorney were “overly aggressive,” drove him to become “embroiled in apublic feud with these individuals,” and caused him to engage in “actions that fell outside of the legitimate exercise of the powers of his office.” Furthermore, the JSC found that defendant’s “communication with other judges through suggested orders, and his appellate filings in defense of such suggested orders” after he had recused himself, “created a public perception of a conflict of interest which threatens the public’s faith and confidence in the integrity and impartiality of [defendant’s] actions in these matters.” The public reprimand of defendant concluded:
The above-referenced actions by [defendant] constitute a significant violation of the principles of personal conduct embodied in the North Carolina Code of Judicial *268 Conduct_[Defendant’s] overly aggressive conduct displayed toward the District Attorney’s office and certain employees of the Town of Kill Devil Hills, and his misuse of the powers of his judicial office in connection thereto, resulted in the public perception of a conflict of interest between [defendant] and the District Attorney’s office and the town of Kill Devil Hills, which brought the judiciary into disrepute and threatened public faith and confidence in the integrity and impartiality of the judiciary.
Defendant accepted the reprimand as indicated by his 6 March 2013 signature, and its official filing on 8 March 2013 constituted the JSC’s final action on the matter.
On 6 March 2015, exactly two years after defendant accepted the JSC’s public reprimand, the State Bar commenced a disciplinary action against defendant by filing a complaint with the DHC. The State Bar alleged that defendant’s conduct constituted seventeen separate violations of North Carolina Rule of Professional Conduct 8.4(d)[1] and requested that the DHC take disciplinary action against defendant in accordance with N.C.G.S. § 84-28(a) and section B.0114 of the Discipline and Disability Rules of the North Carolina State Bar. Defendant filed a motion to dismiss the State Bar’s complaint dated 16 March 2015 and an answer to the complaint on 30 March 2015. The DHC denied defendant’s motion to dismiss on 30 April 2015, and defendant filed a petition for discretionary review with this Court, which was denied and certified to the North Carolina Court of Appeals by order entered on 28 January 2016. Upon reconsideration, this Court issued an order ex mero motu on 27 May 2016 deeming “the question presented by this case to be of such importance that the invocation of our supervisory jurisdiction is warranted.” We issued a writ of certiorari to review the following question:
Do the North Carolina State Bar Council and the Disciplinary Hearing Commission have the jurisdictional authority to discipline a judge of the General Court of Justice for conduct as a judge for which the judge has already been disciplined by the Judicial Standards Commission?
This Court stayed all proceedings before the DHC “pending full briefing by the parties in this Court and our determination of this question.”
*269 Defendant argues that Article IV, Section 17(2) of the North Carolina Constitution and Chapter 7A, Article 30 of the General Statutes convey to this Court exclusive, original jurisdiction over the discipline of members of the General Court of Justice. Consequently, defendant contends that the DHC infringes upon this Court’s jurisdiction by initiating attorney disciplin,ary proceedings against a sitting member of the General Court of Justice for conduct while in office. Defendant therefore asserts that the DHC erred in failing to grant his motion to dismiss the State Bar’s complaint against him. We agree.
The North Carolina State Bar was created by the General Assembly in 1933 “as an agency of the State of North Carolina.” Act of Apr. 3,1933, ch. 210, sec. 1, 1933 N.C. Pub. [Sess.] Laws 313, 313 (codified at N.C.G.S. § 84-15 (2015)). “Subject to the superior authority of the General Assembly to legislate thereon by general laws,” the State Bar Council was “vested, as an agency of the State, with control of the discipline and disbarment of attorneys practicing law in this State.” Id., sec. 9, at 319 (codified at N.C.G.S. § 215(9) (Supp. 1933)). We have recognized that the “purpose of the statute creating the North Carolina State Bar was to enable the bar to render more effective service in improving the administration of justice, particularly in dealing with the problem ... of dis-cipling [sic] and disbarring attorneys at law.” Baker v. Varser, 240 N.C. 260, 267, 82 S.E.2d 90, 95-96 (1954). The General Assembly enhanced the disciplinary function of the State Bar in 1975 by creating the DHC and authorizing it to “hold hearings in discipline, incapacity and disability matters, to make findings of fact and conclusions of law after such hearings, and to enter orders necessary to carry out the duties delegated to it by the council.” Act of June 13, 1975, ch. 582, sec. 6, 1975 N.C. Sess. Laws 656, 658-59 (codified at N.C.G.S. § 84-28.1 (Supp. 1975)). The DHC, as a committee of the Council, see N.C.G.S. § 84-23(b) (2015), maintains broad jurisdiction to exercise these powers because “[a]ny attorney admitted to practice law in this State is subject to the disciplinary jurisdiction of the Council,” id. § 84-28(a) (2015).
Notwithstanding the well-established statutory authority of the State Bar to discipline attorneys, in 1971 the North Carolina Courts Commission (the Commission) submitted a report to the General Assembly outlining, inter alia, the need for a new, formal method to address misconduct by members of the state judiciary. See State of N.C. Courts Comm’n, Report of the Courts Commission to the North Carolina General Assembly 19-30 (1971) [hereinafter Courts Commission Report], The Commission noted that at that time, there was “no formal means for disciplining any judge, short of removal, and impeachment [was] the sole means for *270 removing an appellate or superior court judge for misconduct.” Id. at 19. The Commission concluded that these measures were entirely inadequate to regulate the judiciary, noting the inefficiency, expense, and partisan nature of impeachment proceedings, as well as the fact that no judge had been removed by impeachment in North Carolina since 1868. Id. at 19-20. In addition, the Commission determined that the type of behavior potentially requiring impeachment and removal of a judge is extremely rare, thereby justifying the need for discipline proportionate to “a kind of judicial misbehavior for which removal is too severe, a kind that can usually be corrected by action within the judicial system without sacrificing the judge.” Id. at 21. The Commission concluded that a “flexible machinery that can handle minor cases as well as major ones is an urgent and widely felt need.” Id.
In determining the form and procedure of a potential system for judicial discipline, the Commission recognized “[t]he need for a truly effective mechanism for disciplining or removing judges” that would account for both “the tradition of [judicial] independence” and the “larger public interest in the efficient and untainted administration of justice.” Id. at 20. The Commission noted that several other states had attempted to satisfy these interests by establishing independent judicial qualifications commissions. Id. at 22-25. The Commission concluded that through such disciplinary bodies:
[t]he public is assured of an honest, able, efficient bench, while at the same time the independence of the judiciary is fully protected. And since the system permits the judiciary to police its own ranks, with any decision to censure, remove or retire coming from the supreme court, temptation of the executive or legislative branches to involve themselves in these matters is minimized.
Id. at 26. Therefore, the Commission recommended an amendment to the North Carolina Constitution “authorizing an additional procedure for discipline and removal of judges for misconduct or disability” and the creation of the JSC.[2] Id. at 27. Although the Commission ultimately left the procedures and composition of the JSC “to the wisdom of the General Assembly,” id., it recommended, inter alia, that JSC proceedings should be “confidential until such time as [the JSC] ma[kes] its final recommendations to the Supreme Court” so as to protect judges from *271 groundless accusations, ensure “[p]ublic confidence in the integrity of the courts,” and “protect complainants and witnesses, many of whom would be reluctant to complain or testify for fear of publicity or reprisal.” Id. at 29-30. The Commission also recommended that the “majority of all members of the Supreme Court must concur in any censure or removal order, or in an order to take no action (dismiss) the proceedings,” highlighting its intention that the Supreme Court have exclusive jurisdiction over judicial discipline. Id. at 30. Notably, the Commission stated that the JSC “would be analogous to the censure and disbarment machinery of the organized bar - machinery long ago recognized as essential to protect the image of the legal profession.” Id. at 21. This statement illustrates the Commission’s view that the State Bar’s disciplinary proceedings did not extend to the judiciary and that amending the Constitution and creating the JSC was intended to fill that void.
In June 1971 the General Assembly enacted the Judicial Standards Commission Act and proposed an amendment to the North Carolina Constitution authorizing the statute.[3] In re Peoples, 296 N.C. 109, 163, 250 S.E.2d 890, 921 (1978), cert. denied, 442 U.S. 929 (1979). The amendment was adopted by the voters in 1972 and became Article IV, Section 17(2), which provides:
The General Assembly shall prescribe a procedure . . . for the censure and removal of a Justice or Judge of the General Court of Justice for wilful misconduct in office, ■wilful and persistent failure to perform his duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
N.C. Const. art. IV, § 17(2); Thad Eure, Sec’y of State, North Carolina Manual 1973, at 432 (John L. Cheney, Jr. ed.) (noting date of amendment adoption).
The General Assembly fulfilled this constitutional mandate when the corresponding legislation became effective on 1 January 1973 as Article 30 of Chapter 7A of the General Statutes. Act of June 17, 1971, ch. 590, 1971 N.C. Sess. Laws 517 (codified at N.C.G.S. §§ 7A-375 to -377 (Supp. *272 1971)). The stated purpose of Article 30 “is to provide for the investigation and resolution of inquiries concerning the qualification or conduct of any judge or justice of the General Court of Justice. The procedure for discipline of any judge or justice of the General Court of Justice shall be in accordance with this Article.” N.C.G.S. § 7A-374.1 (2015). Accordingly, section 7A-375 of Article 30 provides for the formation of the thirteen-member JSC, with five of those members, including the Court of Appeals judge who serves as chair of the JSC, being appointed by the Chief Justice of the Supreme Court. Id. § 7A-375(a) (2015). The statute then conveys authority to the JSC to adopt and amend its own procedural rules “subject to the approval of the Supreme Court.” Id. § 7A-375(g) (2015).
Disciplinary proceedings against a judge[4] begin when a citizen of the State files “a written complaint with the Commission concerning the qualifications or conduct of any justice or judge of the General Court of Justice,” or when the JSC initiates an investigation on its own motion. Id. § 7A-377(a) (2015). If the JSC concludes from its investigation that disciplinary proceedings are warranted, it will issue a “notice and statement of charges.” Id. § 7A-377(a5) (2015). An answer, additional filings, and a hearing generally will follow. See id. Viewing the entire framework of Article 30, we have concluded that the role of the JSC is to “serve [ ] ‘as an arm of the Court to conduct hearings for the purpose of aiding the Supreme Court in determining whether a judge is unfit or unsuitable.’ ” In re Hayes, 356 N.C. 389, 398, 584 S.E.2d 260, 266 (2002) (quoting In re Tucker, 348 N.C. 677, 679, 501 S.E.2d 67, 69 (1998)).
As for the actual administration of judicial discipline, presently the JSC has the exclusive authority only to issue an offending judge “a private letter of caution” for violations of the North Carolina Code of Judicial Conduct that are “not of such a nature as would warrant a recommendation of public reprimand, censure, suspension, or removal.” N.C.G.S. § 7A-376(a) (2015). Imposition of those more serious forms of discipline now falls within the exclusive jurisdiction of the Supreme Court “fu]pon recommendation of the Commission.” Id. § 7A-376(b) (2015).[5]In *273 those “proceedings authorized by G.S. 7A-376” we have determined that “this Court sits not as an appellate court but rather as a court of original jurisdiction,” In re Peoples, 296 N.C. at 147, 250 S.E.2d at 912 (citation omitted), and that “original jurisdiction to discipline judges lies solely within the Supreme Court by virtue of statutory authority,” In re Renfer, 345 N.C. 632, 635, 482 S.E.2d 540, 542 (1997) (citing In re Peoples, 296 N.C. at 147, 250 S.E.2d at 912). Therefore, we have concluded that the “final authority to discipline judges lies solely with the Supreme Court.” In re Hayes, 356 N.C. at 398, 584 S.E.2d at 266 (citing In re Peoples, 296 N.C. at 146-47, 250 S.E.2d at 911-12).
“In obedience to” Article IV, Section 17(2), the legislature enacted Article 30, thus fulfilling “the intent of the General Assembly to provide the machineiy and prescribe the procedure for the censure and removal of justices and judges for wilful misconduct in office, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” In re Hardy, 294 N.C. 90, 96, 240 S.E.2d 367, 372 (1978). We have upheld the General Assembly’s plan, noting that “[i]t seems both appropriate and in accordance with the constitutional plan that the Supreme Court... should [ ] have final jurisdiction over the censure and removal of the judges and justices.” In re Martin, 295 N.C. 291, 299-300, 245 S.E.2d 766, 771 (1978).
Aside from the section 7A-375 requirement that four members of the JSC be “members of the State Bar who have actively practiced in the courts of the State for at least 10 years,” N.C.G.S. § 7A-375(a), Article 30 makes no other provision for the involvement of the State Bar in the discipline of judges. Furthermore, although the JSC has existed for more than forty years, the State Bar can cite to no previous instances of the DHC’s claiming concurrent jurisdiction to discipline a sitting judge for conduct while in office. Instead, the DHC has pursued disciplinary action against a judge for his conduct as an attorney before becoming a judge, see N. C. State Bar v. Ethridge, 188 N.C. App. 653, 657 S.E.2d 378 (2008), and against an attorney who was no longer a member of the General Court of Justice, see N.C. State Bar v. Badgett, 212 N.C. App. 420, 713 S.E.2d 791, 2011 WL 2226426 (2011) (unpublished) (Badgett III).
Ethridge involved an appeal to the Court of Appeals from the decision of the DHC to disbar Judge James B. Ethridge. 188 N.C. App. at 655, 657 S.E.2d at 380. Judge Ethridge was elected to the district court in 2004. Id. at 655, 657 S.E.2d at 380. Several years before taking the bench, Judge Ethridge had represented a sixty-nine-year-old woman named Rosalind Sweet, who suffered from dementia. Id. at 655, 657 S.E.2d at 380. Judge Ethridge was investigated and ultimately disbarred by the *274 DHC for depositing funds entrusted to him by Sweet into his own personal checking account, disbursing those funds for the benefit of himself and third parties, preparing and recording a deed conveying Sweet’s real estate to himself without her approval, and “falsely representing on the public record that he had given Ms. Sweet $48,000 in consideration for the property she deeded to him.” Id. at 657-58, 657 S.E.2d at 381-82. Finding “adequate and substantial evidence supporting the DHC’s findings and [that] those findings supported] its conclusions,” the Court of Appeals upheld the DHC’s decision to disbar Judge Ethridge. Id. at 670, 657 S.E.2d at 388-89.
In Badgett III the Court of Appeals considered the decision of the DHC to disbar former judge Mark H. Badgett after his removal from office. 2011 WL 2226426, at *1. Judge Badgett had been censured and suspended from office for sixty days by this Court in March 2008 based upon the JSC’s findings that he had failed, inter alia, to disclose to interested parties his business relationship with an attorney who appeared before him in several matters and had failed to disqualify himself from those matters. In re Badgett, 362 N.C. 202, 203-04, 210, 657 S.E.2d 346, 347-48, 351 (2008) (Badgett I). In addition, the JSC had determined that Judge Badgett coerced a guilty plea from a criminal defendant and attempted to do so with another criminal defendant. Id. at 203, 657 S.E.2d at 347. In a proceeding arising from a separate incident, Judge Badgett was found to have engaged in additional misconduct and subsequently was censured, removed from office, and barred from ever holding another judicial office by this Court. In re Badgett, 362 N.C. 482, 483-87, 491, 666 S.E.2d 743, 744-46, 749 (2008) (Badgett II). After Judge Badgett’s removal from office, the DHC exercised its authority to discipline him as a private attorney, utilizing the misconduct that served as the basis for his judicial discipline. Badgett III, 2011 WL 2226426, at *1. The Court of Appeals subsequently affirmed the DHC’s decision to disbar Judge Badgett. Id. at *13.
As an initial matter, we note that Ethridge and Badgett III are decisions of the Court of Appeals that are not binding on this Court. Furthermore, both cases are distinguishable from the present case. Neither Ethridge nor Badgett III conflicts with the General Assembly’s statutory scheme for the discipline of judges in Article 30. In Ethridge, although Judge Ethridge was a member of the General Court of Justice when disbarred, the conduct at issue occurred while he was still an attorney engaged in the private practice of law. See Ethridge, 188 N.C. App. at 655, 657 S.E.2d at 380. By contrast, the conduct in question here occurred while defendant was a member of the General Court of *275 Justice. Similarly, Badgett III is distinguishable because the DHC disbarred Judge Badgett for his conduct while a judge once he was no longer a member of the General Court of Justice. See Badgett III, 2011 WL 2226426, at *3 (“On 10 June 2009, the Bar filed an amended complaint seeking disciplinary action for the misconduct that led to Badgett I and Badgett II.”). The DHC did not attempt to discipline Judge Badgett for his judicial conduct while he was still in office, as the DHC is attempting to do in the present case. Ethridge and Badgett III illustrate only that the DHC has disciplined a sitting judge for conduct as an attorney before becoming a judge, and has disciplined an attorney who was no longer a judge for conduct that occurred while on the bench.
In the instant case the State Bar contends that N.C.G.S. § 7A-410 implies the statutory authority of the DHC to discipline defendant. Section 7A-410 states in pertinent part:
When a judge of the district court, judge of the superior court, judge of the Court of Appeals, justice of the Supreme Court, or a district attorney is no longer authorized to practice law in the courts of this State, the Governor shall declare the office vacant. . . . For purposes of this Article, the term ‘no longer authorized to practice law’ means that the person has been disbarred or suspended and all appeals under G.S. 84-28 have been exhausted.
N.C.G.S. § 7A-410 (2015). The State Bar argues that this statute “would simply have no meaning if the General Assembly intended that the Council and the DHC should have no jurisdiction to discipline a lawyer who was also sitting as a judge.” We disagree. Contrary to the State Bar’s analysis, section 7A-410 simply explains what should occur when, as in Ethridge, a judge is disbarred for conduct that occurred before he became a judge.
The State Bar asserts that a judge is still a lawyer after taking office and therefore, must comply with both the Code of Judicial Conduct and the Rules of Professional Conduct as required by section 84-28.[6] Therefore, the State Bar contends that the DHC may discipline a sitting judge because “[j]udicial discipline concerns the fitness of a judge to serve as a judge. Attorney discipline concerns the fitness of a lawyer *276 to be a lawyer. The same conduct may implicate both fitness to be a judge and fitness to be a lawyer.” We agree that a judge’s conduct may affect his or her fitness to be a lawyer. In Badgett III the DHC disbarred the defendant once he was removed from judicial office; however, while a judge remains in office, only this Court or the JSC may impose discipline for his or her conduct as a judge.
In the present case defendant was a member of the General Court of Justice when he engaged in the misconduct set forth above. As a result, he was investigated and disciplined by the JSC pursuant to sections 7A-376 and 7A-377. Having accepted the JSC’s public reprimand, defendant remains a sitting member of the General Court of Justice. Based upon the history and language of Article 30 of Chapter 7A of the General Statutes, we conclude that jurisdiction to discipline sitting judges for their conduct while in office rests solely with the JSC and this Court, and not with the DHC.[7] Consequently, we hold that the DHC does not have jurisdiction to discipline defendant as a sitting member of the General Court of Justice for his conduct while a member of the General Court of Justice. Accordingly, we reverse the DHC’s denial of defendant’s motion to dismiss the State Bar’s complaint against him and remand this case to the DHC with instructions to dismiss with prejudice the State Bar’s complaint.
REVERSED AND REMANDED.

. Rule 8.4 states, “It is professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice.” N.C. St. B. Rev. R. Prof'l Conduct 8.4(d), 2016 Ann. R. N.C. 1261, 1261-62.

. The Commission noted its preference for the name “Judicial Standards Commission” over “Judicial Qualifications Commission”—the moniker used in several other states. Courts Commission Report at 26.

. Although the statute was passed before adoption of the constitutional amendment, “[t]he General Assembly has power to enact a statute not authorized by the present Constitution where the statute is passed in anticipation of a constitutional amendment authorizing it or provides that it shall take effect upon the adoption of such constitutional amendment.” In re Nowell, 293 N.C. 236, 242, 237 S.E.2d 246, 261 (1977) (quoting Fullam v. Brock, 271 N.C. 145, 149, 155 S.E.2d 737, 739-40 (1967)).

. Article 30 states that “ ‘Judge’ means any justice or judge of the General Court of Justice of North Carolina, including any retired justice or judge who is recalled for service as an emergency judge of any division of the General Court of Justice.” N.C.G.S. § 7A-374.2(5) (2015).

. Prior to the 2013 revisions to Article 30, section 7A-376 permitted the JSC to independently issue public reprimands. See Act of July 26, 2013, ch. 404, sec. 2, 2013 N.C. Sess. Laws 1681, 1682 (codified at N.C.G.S. § 7A-376(a) (2013)). Defendant was disciplined by the JSC pursuant to this earlier version of the statute.

. “Any attorney admitted to practice law in this State is subject to the disciplinary jurisdiction of the Council under such rules and procedures as the Council shall adopt_” N.C.G.S. § 84-28(a).

. Because defendant’s appeal is resolved on these grounds, we do not decide whether the State Bar is estopped from prosecuting conduct for which defendant has already been subject to a binding and final order of discipline by the JSC. We also do not decide whether the DHC violated defendant’s procedural and substantive due process rights.