IN THE SUPREME COURT OF NORTH CAROLINA

No. 208PA15

Filed 21 December 2016

THE NORTH CAROLINA STATE BAR

v.

JERRY R. TILLETT

On writ of certiorari to review the question presented in defendant's petition for discretionary review. Heard in the Supreme Court on 30 August 2016.

*Katherine Jean, Counsel, and David R. Johnson, Jennifer A. Porter, and G. Patrick Murphy, Deputy Counsels, North Carolina State Bar, for plaintiff-appellee.*

*Vandeventer Black LLP, by Norman W. Shearin, David P. Ferrell, and Kevin A. Rust, for defendant-appellant.*

*Roy Cooper, Attorney General, by Melissa L. Trippe, Special Deputy Attorney General, for North Carolina Judicial Standards Commission, amicus curiae.*

JACKSON, Justice.

In this case we consider whether the North Carolina State Bar Disciplinary Hearing Commission (DHC) has the authority to investigate and discipline sitting Judge Jerry R. Tillett (defendant) for his conduct while in office. Because we conclude that the DHC lacks this authority, we reverse the DHC's denial of defendant's motion to dismiss and remand this case to the DHC to dismiss with prejudice the complaint of the North Carolina State Bar (State Bar) against defendant.

Defendant has served continuously as a judge in Judicial District One of the General Court of Justice, Superior Court Division, from the time of the circumstances giving rise to this case until the present. On 16 February 2012, the Judicial Standards Commission (JSC) commenced a formal investigation into defendant's "interactions with employees and officials of the Town of Kill Devil Hills, including his involvement in orders entered against the town, and regarding his interactions with the District Attorney's office of the 1st Prosecutorial District including pressuring that office to pursue certain legal actions." Based on its findings and conclusions, the JSC imposed a public reprimand on defendant.

According to the public reprimand, on 4 April 2010, Kill Devil Hills Police detained defendant's adult son for an unspecified reason. Eleven days later, on 15 April, defendant arranged a meeting with officials from the Town of Kill Devil Hills and its police department in defendant's chambers. Defendant complained about his son's detention "as part of a series of other complaints about incidents of misconduct involving" the police department. According to those who participated in the meeting, defendant then became agitated and confrontational in his warnings to town officials to address the complaints and engaged in "discussion of a superior court judge's ability to remove officials from office," causing some individuals to feel "threatened."

The public reprimand also states that throughout 2011 defendant received "communications from Kill Devil Hills police officers with grievances against Chief of

Police Gary Britt and Assistant Town Manager Shawn Murphy related to personnel issues." During this period, defendant also received "complaints about the performance of the District Attorney of the 1st Prosecutorial District." Concluding from the complaints "that Chief Britt was guilty of professional malfeasance," defendant attempted to convince the District Attorney and members of his staff "that it was their duty to file a petition for the removal of Chief Britt." The District Attorney and his staff "ultimately concluded that there was insufficient evidence to support such a petition." On 24 June 2011, defendant then sent a letter to Chief Britt notifying him about complaints of his professional misconduct and further warning Chief Britt that "to the extent that allegations involve conduct prejudicial to the administration of justice, conduct violative of public policy, and/or violations of criminal law including obstruction of justice, oppression by official, misconduct in public office and/or substantial offense, this office will act appropriately in accord with statutory and/or inherent authority." This letter was printed on defendant's judicial stationery and defendant signed it "in his capacity as Senior Resident Superior Court Judge."

In addition, the public reprimand notes that on 19 September 2011 defendant drafted and executed an order for production of copies of the private personnel records of several town employees, including Chief Britt and Murphy, to be delivered to him "for an in camera review, for the protection of integrity of information, to prevent alteration, spoliation, for evidentiary purposes and or [sic] for disclosure to other

appropriate persons as directed by the Court." Defendant issued this order on his own initiative without a request from any employee of the town, anyone in the District Attorney's office, or any of the complainants who previously had contacted defendant.

The public reprimand further notes that on 5 January 2012, defendant sent a letter to Murphy, also on judicial stationery "and signed in his capacity as Senior Resident Superior Court Judge," alleging receipt of "complaints of professional misconduct" against Murphy and warning Murphy that "to the extent that allegations involve conduct prejudicial to the administration of justice, conduct violative of public policy, and/or violations of criminal law including obstruction of justice, oppression by official, misconduct in public office and/or substantial offense, this office will act appropriately in accord with statutory and/or inherent authority." That same day defendant met with the District Attorney and a member of the District Attorney's staff "in reference to complaints lodged against the District Attorney's office and the office's failure to file a petition against Chief Britt." A sheriff's deputy was present at this meeting in defendant's chambers, which, in conjunction with defendant's "critical and aggressive comments, had the effect of intimidating the officials from the District Attorney's office."

Finally, the reprimand states that even though defendant later recused himself from matters involving complaints against the Kill Devil Hills Police

Department and the District Attorney's office, he continued to involve himself in the adjudication of the complaints by communicating with judges who were involved in the matter "through suggested orders, and his appellate filings in defense of such suggested orders."

Based on these findings of fact, the JSC determined that both defendant's initial confrontation with town officials in his chambers and later in his capacity as Chief Resident Superior Court Judge "created a reasonable and objective perception of conflict that tainted his subsequent use of the powers of his judicial office in matters adversarial to these officials." The JSC also determined that defendant's attempts to address complaints against Chief Britt, Murphy, and the District Attorney were "overly aggressive," drove him to become "embroiled in a public feud with these individuals," and caused him to engage in "actions that fell outside of the legitimate exercise of the powers of his office." Furthermore, the JSC found that defendant's "communication with other judges through suggested orders, and his appellate filings in defense of such suggested orders" after he had recused himself, "created a public perception of a conflict of interest which threatens the public's faith and confidence in the integrity and impartiality of [defendant's] actions in these matters." The public reprimand of defendant concluded:

> The above-referenced actions by [defendant] constitute a significant violation of the principles of personal conduct embodied in the North Carolina Code of Judicial Conduct . . . . [Defendant's] overly aggressive conduct displayed toward the District Attorney's office and

> certain employees of the Town of Kill Devil Hills, and his misuse of the powers of his judicial office in connection thereto, resulted in the public perception of a conflict of interest between [defendant] and the District Attorney's office and the town of Kill Devil Hills, which brought the judiciary into disrepute and threatened public faith and confidence in the integrity and impartiality of the judiciary.

Defendant accepted the reprimand as indicated by his 6 March 2013 signature, and its official filing on 8 March 2013 constituted the JSC's final action on the matter.

On 6 March 2015, exactly two years after defendant accepted the JSC's public reprimand, the State Bar commenced a disciplinary action against defendant by filing a complaint with the DHC. The State Bar alleged that defendant's conduct constituted seventeen separate violations of North Carolina Rule of Professional Conduct 8.4(d)[1] and requested that the DHC take disciplinary action against defendant in accordance with N.C.G.S. § 84-28(a) and section B.0114 of the Discipline and Disability Rules of the North Carolina State Bar. Defendant filed a motion to dismiss the State Bar's complaint dated 16 March 2015 and an answer to the complaint on 30 March 2015. The DHC denied defendant's motion to dismiss on 30 April 2015, and defendant filed a petition for discretionary review with this Court, which was denied and certified to the North Carolina Court of Appeals by order entered on 28 January 2016. Upon reconsideration, this Court issued an order *ex*

---

[1] Rule 8.4 states, "It is professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice." N.C. St. B. Rev. R. Prof'l Conduct 8.4(d), 2016 Ann. R. N.C. 1261, 1261-62.

*mero motu* on 27 May 2016 deeming "the question presented by this case to be of such importance that the invocation of our supervisory jurisdiction is warranted." We issued a writ of certiorari to review the following question:

> Do the North Carolina State Bar Council and the Disciplinary Hearing Commission have the jurisdictional authority to discipline a judge of the General Court of Justice for conduct as a judge for which the judge has already been disciplined by the Judicial Standards Commission?

This Court stayed all proceedings before the DHC "pending full briefing by the parties in this Court and our determination of this question."

Defendant argues that Article IV, Section 17(2) of the North Carolina Constitution and Chapter 7A, Article 30 of the General Statutes convey to this Court exclusive, original jurisdiction over the discipline of members of the General Court of Justice. Consequently, defendant contends that the DHC infringes upon this Court's jurisdiction by initiating attorney disciplinary proceedings against a sitting member of the General Court of Justice for conduct while in office. Defendant therefore asserts that the DHC erred in failing to grant his motion to dismiss the State Bar's complaint against him. We agree.

The North Carolina State Bar was created by the General Assembly in 1933 "as an agency of the State of North Carolina." Act of Apr. 3, 1933, ch. 210, sec. 1, 1933 N.C. Pub. [Sess.] Laws 313, 313 (codified at N.C.G.S. § 84-15 (2015)). "Subject to the superior authority of the General Assembly to legislate thereon by general

laws," the State Bar Council was "vested, as an agency of the State, with control of the discipline and disbarment of attorneys practicing law in this State." *Id.*, sec. 9, at 319 (codified at N.C.G.S. § 215(9) (Supp. 1933)). We have recognized that the "purpose of the statute creating the North Carolina State Bar was to enable the bar to render more effective service in improving the administration of justice, particularly in dealing with the problem . . . of discipling [sic] and disbarring attorneys at law." *Baker v. Varser*, 240 N.C. 260, 267, 82 S.E.2d 90, 95-96 (1954). The General Assembly enhanced the disciplinary function of the State Bar in 1975 by creating the DHC and authorizing it to "hold hearings in discipline, incapacity and disability matters, to make findings of fact and conclusions of law after such hearings, and to enter orders necessary to carry out the duties delegated to it by the council." Act of June 13, 1975, ch. 582, sec. 6, 1975 N.C. Sess. Laws 656, 658-59 (codified at N.C.G.S. § 84-28.1 (Supp. 1975)). The DHC, as a committee of the Council, *see* N.C.G.S. § 84-23(b) (2015), maintains broad jurisdiction to exercise these powers because "[a]ny attorney admitted to practice law in this State is subject to the disciplinary jurisdiction of the Council," *id.* § 84-28(a) (2015).

Notwithstanding the well-established statutory authority of the State Bar to discipline attorneys, in 1971 the North Carolina Courts Commission (the Commission) submitted a report to the General Assembly outlining, *inter alia,* the need for a new, formal method to address misconduct by members of the state judiciary. *See* State of N.C. Courts Comm'n, *Report of the Courts Commission to the*

*North Carolina General Assembly* 19-30 (1971) [hereinafter *Courts Commission Report*]. The Commission noted that at that time, there was "no formal means for disciplining any judge, short of removal, and impeachment [was] the sole means for removing an appellate or superior court judge for misconduct." *Id.* at 19. The Commission concluded that these measures were entirely inadequate to regulate the judiciary, noting the inefficiency, expense, and partisan nature of impeachment proceedings, as well as the fact that no judge had been removed by impeachment in North Carolina since 1868. *Id.* at 19-20. In addition, the Commission determined that the type of behavior potentially requiring impeachment and removal of a judge is extremely rare, thereby justifying the need for discipline proportionate to "a kind of judicial misbehavior for which removal is too severe, a kind that can usually be corrected by action within the judicial system without sacrificing the judge." *Id.* at 21. The Commission concluded that a "flexible machinery that can handle minor cases as well as major ones is an urgent and widely felt need." *Id.*

In determining the form and procedure of a potential system for judicial discipline, the Commission recognized "[t]he need for a truly effective mechanism for disciplining or removing judges" that would account for both "the tradition of [judicial] independence" and the "larger public interest in the efficient and untainted administration of justice." *Id.* at 20. The Commission noted that several other states had attempted to satisfy these interests by establishing independent judicial

qualifications commissions.  *Id.* at 22-25.  The Commission concluded that through such disciplinary bodies:

> [t]he public is assured of an honest, able, efficient bench, while at the same time the independence of the judiciary is fully protected.  And since the system permits the judiciary to police its own ranks, with any decision to censure, remove or retire coming from the supreme court, temptation of the executive or legislative branches to involve themselves in these matters is minimized.

*Id.* at 26.  Therefore, the Commission recommended an amendment to the North Carolina Constitution "authorizing an additional procedure for discipline and removal of judges for misconduct or disability" and the creation of the JSC.[2]  *Id.* at 27.  Although the Commission ultimately left the procedures and composition of the JSC "to the wisdom of the General Assembly," *id.*, it recommended, *inter alia*, that JSC proceedings should be "confidential until such time as [the JSC] ma[kes] its final recommendations to the Supreme Court" so as to protect judges from groundless accusations, ensure "[p]ublic confidence in the integrity of the courts," and "protect complainants and witnesses, many of whom would be reluctant to complain or testify for fear of publicity or reprisal."  *Id.* at 29-30.  The Commission also recommended that the "majority of all members of the Supreme Court must concur in any censure or removal order, or in an order to take no action (dismiss) the proceedings," highlighting its intention that the Supreme Court have exclusive jurisdiction over

---

[2] The Commission noted its preference for the name "Judicial Standards Commission" over "Judicial Qualifications Commission"—the moniker used in several other states.  *Courts Commission Report* at 26.

judicial discipline. *Id.* at 30. Notably, the Commission stated that the JSC "would be analogous to the censure and disbarment machinery of the organized bar -- machinery long ago recognized as essential to protect the image of the legal profession." *Id.* at 21. This statement illustrates the Commission's view that the State Bar's disciplinary proceedings did not extend to the judiciary and that amending the Constitution and creating the JSC was intended to fill that void.

In June 1971 the General Assembly enacted the Judicial Standards Commission Act and proposed an amendment to the North Carolina Constitution authorizing the statute.[3] *In re Peoples*, 296 N.C. 109, 163, 250 S.E.2d 890, 921 (1978), *cert. denied*, 442 U.S. 929 (1979). The amendment was adopted by the voters in 1972 and became Article IV, Section 17(2), which provides:

> The General Assembly shall prescribe a procedure . . . for the censure and removal of a Justice or Judge of the General Court of Justice for wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

N.C. Const. art. IV, § 17(2); Thad Eure, Sec'y of State, *North Carolina Manual* 1973, at 432 (John L. Cheney, Jr. ed.) (noting date of amendment adoption).

---

[3] Although the statute was passed before adoption of the constitutional amendment, "[t]he General Assembly has power to enact a statute not authorized by the present Constitution where the statute is passed in anticipation of a constitutional amendment authorizing it or provides that it shall take effect upon the adoption of such constitutional amendment." *In re Nowell*, 293 N.C. 235, 242, 237 S.E.2d 246, 251 (1977) (quoting *Fullam v. Brock*, 271 N.C. 145, 149, 155 S.E.2d 737, 739-40 (1967)).

The General Assembly fulfilled this constitutional mandate when the corresponding legislation became effective on 1 January 1973 as Article 30 of Chapter 7A of the General Statutes. Act of June 17, 1971, ch. 590, 1971 N.C. Sess. Laws 517 (codified at N.C.G.S. §§ 7A-375 to -377 (Supp. 1971)). The stated purpose of Article 30 "is to provide for the investigation and resolution of inquiries concerning the qualification or conduct of any judge or justice of the General Court of Justice. The procedure for discipline of any judge or justice of the General Court of Justice shall be in accordance with this Article." N.C.G.S. § 7A-374.1 (2015). Accordingly, section 7A-375 of Article 30 provides for the formation of the thirteen-member JSC, with five of those members, including the Court of Appeals judge who serves as chair of the JSC, being appointed by the Chief Justice of the Supreme Court. *Id.* § 7A-375(a) (2015). The statute then conveys authority to the JSC to adopt and amend its own procedural rules "subject to the approval of the Supreme Court." *Id.* § 7A-375(g) (2015).

Disciplinary proceedings against a judge[4] begin when a citizen of the State files "a written complaint with the Commission concerning the qualifications or conduct of any justice or judge of the General Court of Justice," or when the JSC initiates an

---

[4] Article 30 states that " 'Judge' means any justice or judge of the General Court of Justice of North Carolina, including any retired justice or judge who is recalled for service as an emergency judge of any division of the General Court of Justice." N.C.G.S. § 7A-374.2(5) (2015).

investigation on its own motion. *Id.* § 7A-377(a) (2015). If the JSC concludes from its investigation that disciplinary proceedings are warranted, it will issue a "notice and statement of charges." *Id.* § 7A-377(a5) (2015). An answer, additional filings, and a hearing generally will follow. *See id.* Viewing the entire framework of Article 30, we have concluded that the role of the JSC is to "serve[ ] 'as an arm of the Court to conduct hearings for the purpose of aiding the Supreme Court in determining whether a judge is unfit or unsuitable.' " *In re Hayes*, 356 N.C. 389, 398, 584 S.E.2d 260, 266 (2002) (quoting *In re Tucker*, 348 N.C. 677, 679, 501 S.E.2d 67, 69 (1998)).

As for the actual administration of judicial discipline, presently the JSC has the exclusive authority only to issue an offending judge "a private letter of caution" for violations of the North Carolina Code of Judicial Conduct that are "not of such a nature as would warrant a recommendation of public reprimand, censure, suspension, or removal." N.C.G.S. § 7A-376(a) (2015). Imposition of those more serious forms of discipline now falls within the exclusive jurisdiction of the Supreme Court "[u]pon recommendation of the Commission." *Id.* § 7A-376(b) (2015).[5] In those "proceedings authorized by G.S. 7A-376" we have determined that "this Court sits not as an appellate court but rather as a court of original jurisdiction," *In re Peoples*, 296

---

[5] Prior to the 2013 revisions to Article 30, section 7A-376 permitted the JSC to independently issue public reprimands. *See* Act of July 26, 2013, ch. 404, sec. 2, 2013 N.C. Sess. Laws 1681, 1682 (codified at N.C.G.S. § 7A-376(a) (2013)). Defendant was disciplined by the JSC pursuant to this earlier version of the statute.

N.C. at 147, 250 S.E.2d at 912 (citation omitted), and that "original jurisdiction to discipline judges lies solely within the Supreme Court by virtue of statutory authority," *In re Renfer*, 345 N.C. 632, 635, 482 S.E.2d 540, 542 (1997) (citing *In re Peoples*, 296 N.C. at 147, 250 S.E.2d at 912). Therefore, we have concluded that the "final authority to discipline judges lies solely with the Supreme Court." *In re Hayes*, 356 N.C. at 398, 584 S.E.2d at 266 (citing *In re Peoples*, 296 N.C. at 146-47, 250 S.E.2d at 911-12).

"In obedience to" Article IV, Section 17(2), the legislature enacted Article 30, thus fulfilling "the intent of the General Assembly to provide the machinery and prescribe the procedure for the censure and removal of justices and judges for wilful misconduct in office, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." *In re Hardy*, 294 N.C. 90, 96, 240 S.E.2d 367, 372 (1978). We have upheld the General Assembly's plan, noting that "[i]t seems both appropriate and in accordance with the constitutional plan that the Supreme Court . . . should [ ] have final jurisdiction over the censure and removal of the judges and justices." *In re Martin*, 295 N.C. 291, 299-300, 245 S.E.2d 766, 771 (1978).

Aside from the section 7A-375 requirement that four members of the JSC be "members of the State Bar who have actively practiced in the courts of the State for at least 10 years," N.C.G.S. § 7A-375(a), Article 30 makes no other provision for the involvement of the State Bar in the discipline of judges. Furthermore, although the

JSC has existed for more than forty years, the State Bar can cite to no previous instances of the DHC's claiming concurrent jurisdiction to discipline a sitting judge for conduct while in office. Instead, the DHC has pursued disciplinary action against a judge for his conduct as an attorney before becoming a judge, *see N.C. State Bar v. Ethridge*, 188 N.C. App. 653, 657 S.E.2d 378 (2008), and against an attorney who was no longer a member of the General Court of Justice, *see N.C. State Bar v. Badgett*, 212 N.C. App. 420, 713 S.E.2d 791, 2011 WL 2226426 (2011) (unpublished) (*Badgett III*).

*Ethridge* involved an appeal to the Court of Appeals from the decision of the DHC to disbar Judge James B. Ethridge. 188 N.C. App. at 655, 657 S.E.2d at 380. Judge Ethridge was elected to the district court in 2004. *Id.* at 655, 657 S.E.2d at 380. Several years before taking the bench, Judge Ethridge had represented a sixty-nine-year-old woman named Rosalind Sweet, who suffered from dementia. *Id.* at 655, 657 S.E.2d at 380. Judge Ethridge was investigated and ultimately disbarred by the DHC for depositing funds entrusted to him by Sweet into his own personal checking account, disbursing those funds for the benefit of himself and third parties, preparing and recording a deed conveying Sweet's real estate to himself without her approval, and "falsely representing on the public record that he had given Ms. Sweet $48,000 in consideration for the property she deeded to him." *Id.* at 657-58, 657 S.E.2d at 381-82. Finding "adequate and substantial evidence supporting the DHC's findings and

[that] those findings support[ed] its conclusions," the Court of Appeals upheld the DHC's decision to disbar Judge Ethridge. *Id.* at 670, 657 S.E.2d at 388-89.

In *Badgett III* the Court of Appeals considered the decision of the DHC to disbar former judge Mark H. Badgett after his removal from office. 2011 WL 2226426, at *1. Judge Badgett had been censured and suspended from office for sixty days by this Court in March 2008 based upon the JSC's findings that he had failed, *inter alia*, to disclose to interested parties his business relationship with an attorney who appeared before him in several matters and had failed to disqualify himself from those matters. *In re Badgett*, 362 N.C. 202, 203-04, 210, 657 S.E.2d 346, 347-48, 351 (2008) (*Badgett I*). In addition, the JSC had determined that Judge Badgett coerced a guilty plea from a criminal defendant and attempted to do so with another criminal defendant. *Id.* at 203, 657 S.E.2d at 347. In a proceeding arising from a separate incident, Judge Badgett was found to have engaged in additional misconduct and subsequently was censured, removed from office, and barred from ever holding another judicial office by this Court. *In re Badgett*, 362 N.C. 482, 483-87, 491, 666 S.E.2d 743, 744-46, 749 (2008) (*Badgett II*). After Judge Badgett's removal from office, the DHC exercised its authority to discipline him as a private attorney, utilizing the misconduct that served as the basis for his judicial discipline. *Badgett III*, 2011 WL 2226426, at *1. The Court of Appeals subsequently affirmed the DHC's decision to disbar Judge Badgett. *Id.* at *13.

As an initial matter, we note that *Ethridge* and *Badgett III* are decisions of the Court of Appeals that are not binding on this Court. Furthermore, both cases are distinguishable from the present case. Neither *Ethridge* nor *Badgett III* conflicts with the General Assembly's statutory scheme for the discipline of judges in Article 30. In *Ethridge*, although Judge Ethridge was a member of the General Court of Justice when disbarred, the conduct at issue occurred while he was still an attorney engaged in the private practice of law. *See Ethridge*, 188 N.C. App. at 655, 657 S.E.2d at 380. By contrast, the conduct in question here occurred while defendant was a member of the General Court of Justice. Similarly, *Badgett III* is distinguishable because the DHC disbarred Judge Badgett for his conduct while a judge once he was no longer a member of the General Court of Justice. *See Badgett III*, 2011 WL 2226426, at *3 ("On 10 June 2009, the Bar filed an amended complaint seeking disciplinary action for the misconduct that led to *Badgett I* and *Badgett II*."). The DHC did not attempt to discipline Judge Badgett for his judicial conduct while he was still in office, as the DHC is attempting to do in the present case. *Ethridge* and *Badgett III* illustrate only that the DHC has disciplined a sitting judge for conduct as an attorney before becoming a judge, and has disciplined an attorney who was no longer a judge for conduct that occurred while on the bench.

In the instant case the State Bar contends that N.C.G.S. § 7A-410 implies the statutory authority of the DHC to discipline defendant. Section 7A-410 states in pertinent part:

When a judge of the district court, judge of the superior court, judge of the Court of Appeals, justice of the Supreme Court, or a district attorney is no longer authorized to practice law in the courts of this State, the Governor shall declare the office vacant. . . . For purposes of this Article, the term 'no longer authorized to practice law' means that the person has been disbarred or suspended and all appeals under G.S. 84-28 have been exhausted.

N.C.G.S. § 7A-410 (2015). The State Bar argues that this statute "would simply have no meaning if the General Assembly intended that the Council and the DHC should have no jurisdiction to discipline a lawyer who was also sitting as a judge." We disagree. Contrary to the State Bar's analysis, section 7A-410 simply explains what should occur when, as in *Ethridge*, a judge is disbarred for conduct that occurred before he became a judge.

The State Bar asserts that a judge is still a lawyer after taking office and therefore, must comply with both the Code of Judicial Conduct and the Rules of Professional Conduct as required by section 84-28.[6] Therefore, the State Bar contends that the DHC may discipline a sitting judge because "[j]udicial discipline concerns the fitness of a judge to serve as a judge. Attorney discipline concerns the fitness of a lawyer to be a lawyer. The same conduct may implicate both fitness to be a judge and fitness to be a lawyer." We agree that a judge's conduct may affect his or

---

[6] "Any attorney admitted to practice law in this State is subject to the disciplinary jurisdiction of the Council under such rules and procedures as the Council shall adopt . . . ." N.C.G.S. § 84-28(a).

her fitness to be a lawyer. In *Badgett III* the DHC disbarred the defendant once he was removed from judicial office; however, while a judge remains in office, only this Court or the JSC may impose discipline for his or her conduct as a judge.

In the present case defendant was a member of the General Court of Justice when he engaged in the misconduct set forth above. As a result, he was investigated and disciplined by the JSC pursuant to sections 7A-376 and 7A-377. Having accepted the JSC's public reprimand, defendant remains a sitting member of the General Court of Justice. Based upon the history and language of Article 30 of Chapter 7A of the General Statutes, we conclude that jurisdiction to discipline sitting judges for their conduct while in office rests solely with the JSC and this Court, and not with the DHC.[7] Consequently, we hold that the DHC does not have jurisdiction to discipline defendant as a sitting member of the General Court of Justice for his conduct while a member of the General Court of Justice. Accordingly, we reverse the DHC's denial of defendant's motion to dismiss the State Bar's complaint against him and remand this case to the DHC with instructions to dismiss with prejudice the State Bar's complaint.

REVERSED AND REMANDED.

---

[7] Because defendant's appeal is resolved on these grounds, we do not decide whether the State Bar is estopped from prosecuting conduct for which defendant has already been subject to a binding and final order of discipline by the JSC. We also do not decide whether the DHC violated defendant's procedural and substantive due process rights.

*MARTIN, C.J., concurring*

Chief Justice MARTIN concurring.

I fully join the majority opinion. The Constitution of North Carolina requires that the General Assembly "prescribe a procedure, in addition to impeachment and address set forth in this section . . . for the censure and removal of a Justice or Judge of the General Court of Justice." N.C. Const. art. IV, § 17(2). The constitution thus provides for only three methods to discipline sitting judges: impeachment, address, and "a procedure" prescribed by the General Assembly.

The procedure that the General Assembly has, in fact, prescribed establishes the Judicial Standards Commission (JSC) as the sole mechanism by which sitting judges may be disciplined or removed. *See* N.C.G.S. §§ 7A-374.1 to -377 (2015). Indeed, the statutory text specifically mandates that "[t]he procedure for discipline of any judge or justice of the General Court of Justice shall be in accordance with this Article." *Id.* § 7A-374.1. Judges therefore cannot be disciplined or removed in any way other than impeachment, address, or the statutory procedure that the General Assembly has devised.

By initiating disciplinary proceedings against a sitting judge for conduct that the judge engaged in while on the bench, the State Bar is trying to circumvent both the constitution and the prescribed statutory procedure. I write separately to note the wisdom of the overall scheme that the General Assembly has prescribed, and to elucidate why the law should not expose sitting judges to discipline by the State Bar for actions that they take while they are members of the General Court of Justice.

The General Assembly's procedure places recommendations for judicial

discipline and removal in the hands of the JSC and final decisions on discipline and removal in the hands of this Court. Other than the JSC's power to issue private letters of caution, *see id.* § 7A-377(a3), the JSC functions solely "as an arm of the Court" that "conduct[s] hearings for the purpose of aiding the Supreme Court in determining whether a judge" should be disciplined or removed from the bench. *In re Hardy*, 294 N.C. 90, 97, 240 S.E.2d 367, 372 (1978).[8] This procedure is sound because it preserves judicial independence. In the words of United States Supreme Court Justice Stephen Breyer, judicial independence is important because the justice that stems from proper adjudication "is only attainable . . . if judges actually decide according to law, and are perceived by everyone around them to be deciding according to law, rather than according to their own whim or in compliance with the will of powerful political actors." Stephen G. Breyer, *Judicial Independence in the United States*, 40 St. Louis U. L.J. 989, 996 (1996). For society to be governed by the rule of law, judges must be able to apply the law dispassionately, "without fear of retribution or the need to curry favor." *See* Charles Gardner Geyh et al., *Judicial Conduct and Ethics* § 1.04, at 1-10 (5th ed. 2013). If a judge is fearful that a lawyer or group of lawyers who appear before her will attempt to expose her to discipline, then she may

---

[8] Before 2013, the JSC could issue public letters of reprimand without this Court's permission. *See, e.g.*, N.C.G.S. § 7A-377(a4) (2011); *cf. id.* § 7A-377(a4) (2013). But it has always been within this Court's sole discretion whether to accept the JSC's recommendation to censure or remove a judge. *See In re Hardy*, 294 N.C. at 97, 240 S.E.2d at 372 (noting as of 1978 that the JSC's "recommendations are not binding upon the Supreme Court, which will consider the evidence on both sides and exercise its independent judgment as to whether it should censure, remove[,] or decline to do either" (quoting *In re Nowell*, 293 N.C. 235, 244, 237 S.E. 2d 246, 252 (1977) (per curiam))).

not be able to act according to her best legal judgment in the cases that come before her. This is just one example of why judges must, to the greatest extent possible, be free from all outside pressures—political, financial, and personal—that could affect their ability to act with fairness and impartiality.

Judges, of course, need to be held accountable when they act in ways that do not befit a judge. Otherwise, public trust and confidence in the courts would erode. Judges cannot be above the law, and that is why the JSC exists. The JSC arose out of the Courts Commission of 1971's recommendation that a disciplinary process be created that would, as the majority notes, balance the need for judicial independence with the need for judicial accountability. *See* State of N.C. Courts Comm'n, *Report of the Courts Commission to the North Carolina General Assembly* 19-30 (1971) [hereinafter *Courts Commission Report*]. The JSC's sole mission is to ensure that judges conduct themselves in accordance with the Code of Judicial Conduct. *See* N.C.G.S. § 7A-376. Because this mission is the one goal that unites all of the members of the JSC—which has a diverse set of members culled from the bench, the bar, and citizens who are laypeople in the law, *see id.* § 7A-375(a)—the JSC is far less prone to being influenced by outside motives than other bodies may be. The JSC, with the help of this Court's oversight, is therefore uniquely positioned to balance judicial independence and judicial accountability.

Furthermore, because the JSC is duty-bound to enforce North Carolina's Code of Judicial Conduct, it is duty-bound to uphold judicial independence by the very terms of the Code. The very first words of the Code's Preamble state that "[a]n

independent and honorable judiciary is indispensable to justice in our society," and the Code's first canon states that "[a] judge should uphold the integrity and independence of the judiciary." Code Jud. Conduct pmbl., Canon 1, 2016 N.C. R. Ct. (State) 509, 509. The Code that the JSC enforces thus places judicial independence at the very center of the values that the JSC must uphold.

Other state supreme courts have long since concluded that a system in which attorneys discipline judges is inconsistent with the goal of judicial independence and is contrary to good public policy. For instance, at the mid-point of the twentieth century, the Oklahoma Supreme Court held that lawyer disciplinary bodies cannot discipline members of the judiciary because it "would result in nothing more than discord, and could result in confusion, pernicious partisan political activity concerning the judiciary, and other results not beneficial to the administration of justice." *Chambers v. Cent. Comm. of Okla. Bar Ass'n*, 1950 OK 287, ¶16, 203 Okla. 583, 586, 224 P.2d 583, 586-87 (1950). Some years later, the Alabama Supreme Court concluded that, "regardless of how honorable the motives of the would-be prosecutors may be," it is proper to shield judges from discipline by lawyers acting through the State Bar so that judges "may remain free to function without fear or favor." *Ala. State Bar ex rel. Steiner v. Moore*, 282 Ala. 562, 566, 213 So.2d 404, 408 (1968). Indeed, mindful of the need to "maintain and restore public confidence in the integrity, independence, and impartiality of [its] judiciary," every state "has established a judicial conduct organization charged with investigating and prosecuting complaints against judicial officers." Cynthia Gray, *How Judicial*

*Conduct Commissions Work*, 28 Just. Sys. J. 405, 405 (2007). And in all but two states, "the state supreme court has the final word" on the appropriate disciplinary measure to impose on a sitting judge. Cynthia Gray, *State Supreme Courts Play Key Role in Judicial Discipline*, 86 Judicature 267, 267 (2003). The JSC as it exists in North Carolina thus mirrors the national trend.

For all of these reasons, the best way to ensure judicial independence is to place the JSC and this Court—and no other individual or entity—at the helm of non-impeachment proceedings to discipline or remove judges.

Additionally, there would be practical problems if both the JSC and the State Bar had the power to discipline sitting judges for acts that they perform while they are on the bench. For example, a judge may be loath to enter into a stipulated disposition with the JSC—even though those dispositions are an effective way to resolve disciplinary disputes in a manner that both does justice in individual proceedings and preserves the public's trust and confidence in the judicial system as a whole—because doing so could adversely affect the judge's ability to defend against a disciplinary proceeding by the State Bar.

Placing the State Bar at the helm of proceedings to discipline judges would also undermine the judiciary's inherent authority to discipline the attorneys that appear in the General Court of Justice. Part of a judge's role is to "take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware." Code Jud. Conduct Canon 3B(3), 2016 N.C. R. Ct. (State) at 510; *see also* N.C.G.S. § 84-36 (2015) (clarifying that the creation of the

24

State Bar does not "disabl[e] or abridg[e] the inherent powers of the court to deal with its attorneys"); *Sisk v. Transylvania Cmty. Hosp., Inc.*, 364 N.C. 172, 182, 695 S.E.2d 429, 436 (2010) ("[A] court possesses inherent authority to discipline attorneys."). This Court has characterized this power as one of "two methods for enforcing attorney discipline." *Sisk*, 364 N.C. at 182, 695 S.E.2d at 436 (citing *In re Delk*, 336 N.C. 543, 550, 444 S.E.2d 198, 201 (1994)). If the State Bar also had the power to discipline judges, judges might be hesitant to exercise their power to discipline attorneys because of the fear of a disciplinary counterattack.

A system in which the State Bar assumes the authority to discipline judges would therefore inevitably impair a judge's ability to perform an important judicial function. It could also place the members of the bench in a no-win scenario because, if a judge were afraid to exercise her inherent powers over attorneys who had engaged in unprofessional conduct, she would be guilty of violating Canon 3B—and then she herself would need to be disciplined. The disciplinary process envisioned by the State Bar would be like having the batter critique the umpire's ball and strike calls, rather than letting the umpire call pitches as he sees them. Under the State Bar's process, a judge would not be free to follow the law as she sees it when considering matters of attorney discipline. The result would be that the justice system would lose a key component of the very public trust that both the State Bar and the JSC are designed to protect and promote.

Furthermore, the State Bar's investigative process could dramatically interfere with the performance of a judge's duties. Under the JSC's process, the

matter remains confidential until this Court issues an order of "public reprimand, censure, suspension, or removal." N.C.G.S. § 7A-377(a6). This ensures that a judge wrongly accused of misconduct is protected against "unjustified public attack." *Courts Commission Report* at 25. But the State Bar's process does not preserve confidentiality once the State Bar's Grievance Committee has found "probable cause to believe that the attorney is guilty of misconduct justifying disciplinary action" and has directed counsel "to prepare and file a complaint against the respondent." 27 NCAC 1B .0113(a), (h) (Oct. 8, 2009); 27 NCAC 1B .0133(a)(1) (Sept. 22, 2016). If a judge were subjected to this process, and an unjustified public attack became public knowledge before the judge was actually found to have committed misconduct, a judge might want to steer clear of even the possibility that someone would bring a grievance against her. That, in turn, could affect how she decided the cases before her and compromise her ability to faithfully follow the law. This practical difference in the State Bar's process would, once again, be inconsistent with the very notion of judicial independence.

In sum, the comprehensive and well-designed scheme prescribed by the General Assembly preserves judicial independence and avoids practical concerns that could result from a process involving a greater number of disciplinary bodies. The scheme envisioned by the State Bar, by contrast, would undermine judicial independence and would present a number of practical problems. Judges must decide according to the law, not based on outside pressures. When judges are free to do so, this in turn increases public confidence in the courts. The current constitutional and

*MARTIN, C.J., concurring*

statutory scheme, which establishes the JSC process as the sole means to discipline sitting judges for conduct committed while an incumbent judge, thus maximizes the public's trust in the courts and enables judges to do justice in every case that comes before them. These are goals of both the judiciary specifically and the legal profession as a whole. And the General Assembly has wisely borne these goals in mind in its statutory procedure for disciplining sitting judges. I therefore concur fully in the majority opinion.

Justice EDMUNDS joins in this concurring opinion.

Justice ERVIN concurring in the result.

Although I agree with my colleagues' decision that the State Bar lacks the authority to seek the imposition of attorney discipline against defendant in this case, I am unable to agree with the Court's apparent determination that the State Bar has no authority to sanction a sitting judge for any reason during the time that the judge remains in office. I would be the first to concede that the constitutional and statutory provisions that we are called upon to construe in this case are in tension, if not in actual conflict.[9] However, when the relevant constitutional and statutory provisions are carefully examined in light of the differing purposes served by the disciplinary systems administered by the Judicial Standards Commission[10] and the State Bar, I believe that there is a way to preserve the core jurisdiction of each agency without any undue friction between or interference with the essential function of each disciplinary system. After construing the relevant constitutional and statutory provisions in the manner that I believe to be appropriate, I agree with the Court that

---

[9] The lack of obvious interaction between the various provisions of the General Statutes applicable to attorney and judicial discipline suggests the appropriateness of action by the General Assembly for the purpose of clarifying the roles that it wishes for the agencies in question to play.

[10] As the majority explains, this Court is the ultimate disciplinary authority under the statutory scheme for judicial discipline set out in Article 30 of Chapter 7A of the General Statutes. Although I will refer to the disciplinary system administered by the Judicial Standards Commission throughout the remainder of this separate opinion, I do so only for purposes of convenience and do not wish to be understood by using that phraseology as overlooking or minimizing the fact that this Court has ultimate responsibility for the more serious disciplinary decisions made in the process administered by the Judicial Standards Commission.

the State Bar lacks the authority to proceed against defendant on the basis of the theory outlined in its complaint, albeit for different reasons than those advanced in the Court's opinion.

According to Article IV, Section 22 of the North Carolina Constitution, "[o]nly persons duly authorized to practice law in the courts of this State shall be eligible for election or appointment as a Justice of the Supreme Court, Judge of the Court of Appeals, Judge of the Superior Court, or Judge of [the] District Court." N.C. Const. art. IV, § 22. "Except as otherwise permitted by law, it shall be unlawful for any person or association of persons, except active members of the Bar of the State of North Carolina," to practice law in this state. N.C.G.S. § 84-4 (2015). In order to regulate the practice of law in North Carolina, the General Assembly has "created as an agency of the State of North Carolina, for the purposes and with the powers hereinafter set forth, the North Carolina State Bar," *id..* § 84-15 (2015), with the State Bar Council having "the authority to regulate the professional conduct of licensed lawyers and State Bar certified paralegals," *id.* § 84-23(a) (2015). The active membership of the State Bar "shall be all persons who have obtained a license or certificate, entitling them to practice law in the State of North Carolina, who have paid the membership dues specified, and who have satisfied all other obligations of membership." *Id.* § 84-16 (2015). "Any attorney admitted to practice law in this State is subject to the disciplinary jurisdiction of the Council under such rules and procedures as the Council shall adopt," *id.* § 84-28(a) (2015), with attorneys being subject to discipline in the event that they are "[c]onvict[ed] of, or . . . [have] tender[ed]

-29-

and accept[ed] . . . a plea of guilty or no contest to, a criminal offense showing professional unfitness," *id.* § 84-28(b)(1) (2015); found to have committed a "violation of the Rules of Professional Conduct adopted and promulgated by the Council in effect at the time of the act," *id.* § 84-28(b)(2) (2015); or made a "[k]nowing misrepresentation of any facts or circumstances surrounding any complaint, allegation or charge of misconduct; fail[ed] to answer any formal inquiry or complaint issued by or in the name of the North Carolina State Bar in any disciplinary matter; or [engaged in] contempt of the Council or any committee of the North Carolina State Bar," *id.* § 84-28(b)(3) (2015). According to Rule 8.4 of the Revised Rules of Professional Conduct, which have been adopted pursuant to the State Bar's rulemaking authority, *id.* § 84-21 (2015), "[i]t is professional misconduct for a lawyer to:"

> (a)   violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> (b)  commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
>
> (c)  engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
>
> (d)   engage in conduct that is prejudicial to the administration of justice;
>
> (e)  state or imply an ability to influence improperly a government agency or official;
>
> (f)   knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial

conduct or other law; or

> (g)  intentionally prejudice or damage his or her client during the course of the professional relationship, except as may be required by Rule 3.3.

N.C. St. B. Rev. R. Prof'l Conduct 8.4, 2016 Ann. R. N.C.  1137, 1260.  "When a judge of the district court, judge of the superior court, judge of the Court of Appeals, justice of the Supreme Court, or a district attorney is no longer authorized to practice law in the courts of this State, the Governor shall declare the office vacant," with "no longer authorized to practice law" being defined as a situation in which "the person has been disbarred or suspended and all appeals under G.S. 84-28 have been exhausted." N.C.G.S. § 7A-410 (2015).

Similarly, Article IV, Section 17(2) of the North Carolina Constitution provides that

> [t]he General Assembly shall prescribe a procedure, in addition to impeachment and address set forth in this section, for the removal of a Justice or Judge of the General Court of Justice for mental or physical incapacity interfering with the performance of his duties which is, or is likely to become, permanent, and for the censure and removal of a Justice or Judge of the General Court of Justice for wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

N.C. Const. art. IV, § 17(2).

> Upon recommendation of the [Judicial Standards] Commission, the Supreme Court may issue a public reprimand, censure, suspend, or remove any judge for willful misconduct in office, willful and persistent failure to

> perform the judge's duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

N.C.G.S. § 7A-376(b) (2015). A violation of the "Code of Judicial Conduct may be deemed conduct prejudicial to the administration of justice that brings the judicial office into disrepute, or willful misconduct in office, or otherwise as grounds for disciplinary proceedings." Code Jud. Conduct pmbl., 2016 Ann. R. N.C. 863, 863.

The relevant constitutional and statutory provisions do not, when read literally, directly address the problem that we face in this case, which stems from the fact that both the Judicial Standards Commission and the State Bar have attempted to sanction defendant based upon the same conduct and a very similar, if not identical, legal theory. As I read the relevant constitutional and statutory provisions, there does not appear to be any obvious bar to the exercise of concurrent jurisdiction by both agencies given that the Judicial Standards Commission has clear responsibility for the discipline of judges and that the State Bar has clear responsibility for the discipline of attorneys, a group of which judicial officials are, of necessity, a subset. The relevant constitutional provisions provide that judges must be lawyers and that the General Assembly must establish a process for addressing judicial incapacity and misconduct without in any way explicitly stating that the rules governing the professional discipline of attorneys do not apply to judges or explicitly providing that the constitutionally required process for disciplining judges overrides the legal obligations otherwise imposed upon members of the State Bar.

Similarly, the relevant statutory provisions, including the rules adopted in accordance with the State Bar's rulemaking authority, simply identify the circumstances under which each agency has the authority to seek to discipline individuals subject to its jurisdiction without acknowledging any limitations on either body's authority arising from the existence of the other. As a result, the language of the relevant constitutional and statutory provisions provides little direct guidance as to how the issue that confronts us in this case should be resolved and certainly does not suggest that authority granted to either body is exclusive.

Upon stepping back, examining the issue that we have before us on a more global level, and giving thought to the relevant rules of constitutional and statutory construction in context, the proper resolution of this case becomes clearer. Although I may be belaboring the obvious, the fact that Article IV, Section 22 requires members of the judiciary to be authorized to practice law in North Carolina necessarily suggests that the State Bar has, and retains, jurisdiction over members of the judiciary even after they assume judicial office.[11] Allowing judges to remain licensed

---

[11] Admittedly, the language of Article IV, Section 22 directly addresses the need for individuals elected or appointed to judicial office to be licensed attorneys. However, this Court has long held that "[c]onstitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption," *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953). In view of the fact that the clear purpose of Article IV, Section 22 was to ensure that members of the judiciary were licensed attorneys, it makes little sense to read that constitutional provision as allowing individuals who were licensed at the time of their election and appointment, but who have been disbarred or otherwise lost their licenses to practice law, to remain in judicial office. In fact, N.C.G.S. § 7A-410 might be subject to constitutional challenge in the event that Article IV, Section 22 was to be read in this manner.

attorneys for any length of time after they have committed serious acts of professional misconduct undermines public confidence in both the judiciary and the legal profession. The strength of this inference is further reinforced by the fact that the General Assembly provided in N.C.G.S. § 7A-410 for the removal from office of judicial officials who have been disbarred without in any way limiting the grounds upon which the judge in question was subject to disbarment. As a result, these constitutional and statutory provisions suggest that the State Bar did not, in fact, lose all authority to discipline lawyers following their elevation to the bench.

On the other hand, there can be little question that the Judicial Standards Commission has primary responsibility for addressing allegations of judicial misconduct. Any other conclusion would constitute a failure to recognize that the process of judicial discipline administered by the Judicial Standards Commission postdates the creation of the process of attorney discipline administered by the State Bar. As the Court notes, had the process for disciplining attorneys been deemed adequate to address issues arising from allegations of judicial misconduct, there would have been little reason for the adoption of Article IV, Section 17(2) of the North Carolina Constitution and the enactment of Article 30 of Chapter 7A of the General Statutes. In addition, the justification for the creation of a system of judicial discipline separate and apart from impeachment by the General Assembly and the imposition of sanctions by the State Bar discussed in the Court's opinion, and the other policy-based justifications advanced in the Chief Justice's concurring opinion, including the necessity for preserving the independence of the judiciary, provide

further support for the proposition that the disciplinary system administered by the Judicial Standards Commission, rather than the disciplinary system administered by the State Bar, should be the primary means for addressing issues of judicial misconduct.

A decision to construe the relevant constitutional and statutory provisions so as to treat the State Bar and the Judicial Standards Commission as having fully concurrent jurisdiction over every conceivable instance of judicial misconduct poses both legal and practical difficulties. As the facts contained in the present record reveal, there will undoubtedly be instances in which the State Bar and the Judicial Standards Commission have differing views as to the manner in which particular allegations of judicial misconduct should be addressed. The State Bar's assertion that it has unlimited authority, regardless of the position taken by the Judicial Standards Commission, to address allegations of judicial misconduct could well put a sitting judge in the position of questioning whether he is entitled to rely on advice provided by the Judicial Standards Commission in resolving particular ethics-related issues, despite the fact that the relevant constitutional and statutory provisions give the Judicial Standards Commission primary responsibility for addressing allegations of judicial misconduct. Similarly, a decision by the State Bar to seek the imposition of professional discipline upon a judicial official who has already been sanctioned by the judicial disciplinary process raises possible collateral estoppel or res judicata issues, not to mention basic questions of fundamental fairness. As a result, given the risk of conflict stemming from the fact that the Judicial Standards Commission and the

State Bar appear to have concurrent jurisdiction over sitting judges and the fact that requiring sitting judges to satisfy multiple regulatory agencies that could take differing views of the manner in which the same issue should be resolved poses obvious legal and practical problems, I believe that it would be appropriate to attempt to determine whether there is any way to read the relevant constitutional and statutory provisions so as to reconcile the State Bar's concurrent jurisdiction over judicial officials in their capacity as lawyers with the Judicial Standards Commission's primary responsibility for addressing issues relating to judicial misconduct.

As an initial matter, I note that the purpose of the process for addressing allegations of judicial misconduct administered by the Judicial Standards Commission is to protect the public against improper judicial actions, while the purpose of the attorney discipline process administered by the State Bar is to protect the public against misconduct by practicing attorneys. For that reason, it is not surprising that the disciplinary authority exercised by each agency focuses on its core function. For example, as has already been noted, the State Bar has the authority to discipline members of the Bar for violating a Rule of Professional Conduct, engaging in criminal conduct or acts of dishonesty, engaging in conduct prejudicial to the administration of justice, claiming the ability to improperly influence a judicial official, assisting a judicial officer in unlawful conduct, or damaging his or her client. For the most part, members of the judiciary are unlikely to violate a Rule of Professional Conduct while acting in a judicial capacity or by claiming the ability to

improperly influence a judicial official, assisting a judicial official in improper conduct, or damaging a client. However, a judicial official could, in some instances, be guilty of criminal conduct, acts of dishonesty, or conduct prejudicial to the administration of justice. Similarly, the disciplinary authority of the Judicial Standards Commission is available when the judicial official engages in willful misconduct in office, persistently fails to perform his or her duties, is habitually intemperate, is convicted of a crime involving moral turpitude, or engages in conduct prejudicial to the administration of justice that brings the judicial office into disrepute. As should be obvious, a judicial official could be guilty of any of these types of misconduct. Thus, given the primary responsibility for judicial discipline assigned to the process administered by the Judicial Standards Commission, the ultimate question before us in this case is the extent, if any, to which the State Bar is entitled to exercise concurrent jurisdiction over judicial officials who engage in the limited range of conduct that could make them liable to attorney discipline.

As a general proposition, I have no difficulty in concluding that the State Bar ought to be able to sanction a judicial official for violating any Rule of Professional Conduct that would have been applicable to the judge at the time that the alleged violation occurred, for committing a criminal act, or for engaging in dishonest or fraudulent conduct. In my opinion, the members of the public should not be subjected to the unfettered risk that individuals who have engaged in such conduct would be allowed to provide them with legal services regardless of their current eligibility to do so. On the other hand, given the risk of conflicting decisions and the other legal

and practical problems that I have outlined above, I have trouble understanding why a judicial official should be subject to discipline by both the Judicial Standards Commission and the State Bar for conduct prejudicial to the administration of justice, particularly when the conduct in question involved actions taken by the judge in the course of carrying out his or her perceived judicial responsibilities. Allowing such a result seems to me to be inconsistent with the principle of statutory construction that, when possible, statutes should be construed in such a manner as to avoid producing an absurd outcome. *Frye Reg'l Med. Ctr., Inc. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (stating that, "where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded" (quoting *Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979))). In addition, it would be consistent with the canon of statutory construction that, "[w]here there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, the two should be read together and harmonized . . . ; but, to the extent of any necessary repugnancy between them, the special statute . . . will prevail over the general statute." *Krauss v. Wayne Cty. Dep't of Soc. Servs.*, 347 N.C. 371, 378, 493 S.E.2d 428, 433 (1997) (second and third alterations in original) (quoting *McIntyre v. McIntyre*, 341 N.C. 629, 631, 461 S.E.2d 745, 747 (1995)). As a result, in order to avoid inconsistent outcomes, the risk of conflicting advice, the potential for claim or

issue preclusion questions to arise, undue confusion, and other difficulties, I believe that the Court should construe the relevant constitutional and statutory provisions in such a way as to preclude the State Bar from proceeding against an attorney on the basis of alleged conduct prejudicial to the administration of justice arising from activities undertaken by a judicial official in the conduct of his or her judicial duties that do not involve a violation of the Rules of Professional Conduct, a criminal act, dishonest or fraudulent conduct, claiming the ability to improperly influence another public official, or assisting another judicial official in committing an act of judicial misconduct[12] and to hold that the Judicial Standards Commission has exclusive responsibility for addressing such allegations.[13]

The Judicial Standards Commission disciplined defendant based upon determinations that his actions involved violations of Canon 1 (requiring a judge to "participate in establishing, maintaining, and enforcing" and to "personally observe[ ] appropriate standards of conduct to ensure that the integrity and independence of

---

[12] Admittedly, conduct that violates these specific rule provisions would be "prejudicial to the administration of justice." However, because the relevant phrase is so broad that it could encompass judicial misconduct committed by a sitting judge arising only from his or her judicial duties, which is outside the purview of the State Bar's jurisdiction, the State Bar may not proceed on that legal theory alone and must, instead, specify how the conduct of a sitting judge violated his or her obligations and responsibilities *as an attorney*.

[13] The validity of this approach is bolstered, at least in my opinion, by the fact that the State Bar's jurisdiction to sanction individuals for conduct prejudicial to the administration of justice is rule-based, while the Judicial Standards Commission's ability to do so stems from the language of the relevant constitutional and statutory provisions, which should not be negated if at all possible. *Sessions v. Columbus County*, 214 N.C. 634, 638, 200 S.E. 418, 420 (1939) (stating that "[r]econciliation is a postulate of constitutional as well as of statutory construction" (citing *Parvin v. Bd. of Comm'rs*, 177 N.C. 508, 99 S.E. 432 (1919))).

the judiciary [are] preserved"), Code Jud. Conduct Canon 1, 2016 Ann. R. N.C. 863, 863; Canon 2A (requiring a judge to "respect and comply with the law" and to "conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"), *id.* Canon 2A, 2016 Ann. R. N.C. at 865; and Canon 3A(3) (requiring a judge to "be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in the judge's official capacity" and obligating a judge to "require similar conduct of lawyers, and of the judge's staff, court officials and others subject to the judge's direction and control"), *id.* Canon 3A(3), 2016 Ann. R. N.C. at 869, of the Code of Judicial Conduct, with these violations having (1) "created a public perception of a conflict of interest which threatens the public's faith and confidence in [his] integrity and impartiality," (2) been "reasonably perceived as coercive and retaliatory," and (3) constituted "conduct prejudicial to the administration of justice." Similarly, the State Bar alleged in the complaint that it filed in this case that defendant had "engaged in conduct that was prejudicial to the administration of justice in violation of Rule 8.4(d) [of the Rules of Professional Conduct]," as evidenced by a number of specific actions that he took in what he believed to be the performance of his judicial duties during his controversy with the Kill Devil Hills Police Department and the District Attorney's Office. In other words, both the Judicial Standards Commission and the State Bar sought to sanction defendant based upon their authority to discipline covered individuals for conduct prejudicial to the administration of justice based upon conduct arising from defendant's performance of his judicial duties. In view of my belief that the State Bar

does not have the authority to seek the imposition of discipline based upon an allegation that the attorney in question engaged in conduct prejudicial to the administration of justice stemming from acts committed while he or she was a member of the judiciary and those acts did not also violate specific obligations and responsibilities imposed upon attorneys, I do not believe that the State Bar has the authority to seek the imposition of attorney discipline upon defendant on the basis of the allegations set out in its complaint. As a result, because I believe that the State Bar's complaint against defendant should be dismissed for this reason, I concur in the result reached by the Court without joining its opinion.

Justices HUDSON and BEASLEY join in this concurring opinion.